**FILED**

JUL 2 0 2011

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAREER COLLEGE ASSOCIATION d/b/a ASSOCIATION OF PRIVATE SECTOR COLLEGES AND UNIVERSITIES, <br><br> 1101 Connecticut Avenue NW <br> Suite 900 <br> Washington, DC 20036, <br><br> Plaintiff, <br><br> v. <br><br> ARNE DUNCAN, in his official capacity as Secretary of the Department of Education, <br><br> Office of the Secretary <br> 400 Maryland Avenue SW <br> Washington, DC 20202; and <br><br> UNITED STATES DEPARTMENT OF EDUCATION, <br><br> 400 Maryland Avenue SW <br> Washington, DC 20202, <br><br> Defendants. | Case: 1:11-cv-01314 <br> Assigned To : Boasberg, James E. <br> Assign. Date : 7/20/2011 <br> Description: Admn Agency Review |

### COMPLAINT AND PRAYER FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff CAREER COLLEGE ASSOCIATION d/b/a ASSOCIATION OF PRIVATE

SECTOR COLLEGES AND UNIVERSITIES ("APSCU") for its complaint against Defendants

the Honorable ARNE DUNCAN, in his official capacity as Secretary of the Department of

Education ("Secretary"), and THE DEPARTMENT OF EDUCATION (the "Department")

alleges, by and through its attorneys, as follows:

## PRELIMINARY STATEMENT

1.     This is an action under the United States Constitution and the Administrative

Procedure Act, 5 U.S.C. §§ 551-706 ("APA"), challenging three regulations recently adopted by

the Department.  The Department adopted two of these regulations, the "Program Approval"

regulations, 75 Fed. Reg. 66,665, 66,676, and the "Reporting and Disclosure" regulations, 75

Fed. Reg. 66,832, 66,948, on October 29, 2010.  The Department adopted the third set of

regulations, the "Gainful Employment" regulations, 76 Fed. Reg. 34,386, 34,448, on June 13,

2011.  The Program Approval and Reporting and Disclosure regulations form part of a sweeping

regulatory regime given full force and effect through the recently issued Gainful Employment

regulations.

2.     As set forth more fully below, APSCU is a voluntary association of private sector

educational institutions whose membership includes more than 1,500 accredited, private

postsecondary schools, institutes, colleges, and universities.  APSCU and its members fully

support lawful, rational regulations governing federal financial aid, but the challenged

regulations are neither lawful nor rational.  Rather, they are contrary to Title IV of the Higher

Education Act of 1965, as amended, 20 U.S.C. § 1070 *et seq*. ("HEA"); arbitrary and capricious

and otherwise in violation of the APA; and, in certain respects, unconstitutional.

3.     Notably, this is not an ordinary-course rulemaking.  The regulations challenged in

this lawsuit emerged out of a notoriously flawed regulatory process that has already led to an

ongoing investigation by the Department's Inspector General; led Members of Congress to call

for congressional investigations; and led Senator Michael Enzi to urge the U.S. Attorney for the

Southern District of New York and the Securities and Exchange Commission ("SEC") to

determine if investigations into allegations of insider trading involving Department officials are

warranted.  A report by the U.S. Government Accountability Office ("GAO"), cited by the

Department as support for its regulations, has been widely criticized. In fact, the GAO has formally admitted many errors and removed the lead author of the report from his position. Wholly apart from the additional legal flaws identified herein, no presumption of regularity should attach to rules adopted in these circumstances.

4.      The Department's regulations invoke a simple, two-word phrase—"gainful employment"—to impose hundreds of pages of unprecedented new limitations on the use of federal financial aid at private sector colleges and universities. For 46 years, Congress has required by statute that certain postsecondary educational programs must "prepare students for gainful employment" in a recognized occupation or profession to be eligible to participate in Title IV financial aid programs. The Department has now concluded that programs prepare students for gainful employment in recognized occupations and professions *only if* they satisfy an entirely new and complex set of tests related to student debt-to-earnings ratios and loan repayment rates.

5.      These regulatory tests are beyond the Department's statutory authority. In the HEA, Congress set forth in detail the Title IV eligibility requirements for institutions, programs, and students. Among other things, those statutory requirements specifically address maximum student debt levels and loan default rates. Nowhere within the HEA has Congress granted the Department authority to override these statutory requirements by regulation.

6.      The statutory provision that the Department mistakenly relies on as authority for its far-reaching regulatory tests requires only that programs *prepare* students for employment that is gainful, not that the students actually secure employment at certain salary levels. The regulations impermissibly evaluate the quality of a school's enrollees, the wealth of those students, those students' labor market decisions, and other similar factors, like economic trends,

that are either beyond the school's ability to control or unrelated to the quality of the school's educational offerings.

7.     Indeed, the regulations impose massive disincentives on private sector schools that currently seek to educate low-income, minority, and other traditionally underserved student populations, because it is those student populations who are the most at risk for failing the Department's arbitrary tests.  Thus, instead of furthering the purpose of increasing the availability of higher education, the Department's regulations will compel schools to limit educational opportunities for traditionally underserved groups—leaving these students with diminished access to higher education and potentially causing them to forgo postsecondary education altogether.

8.     The Gainful Employment regulations are also arbitrary and capricious and otherwise in violation of the APA in numerous other respects.  For example, in the first years of their operation, the regulations will punish programs for outcomes achieved by students who graduated before the adoption of the standards.  Punishing schools for outcomes that are already a matter of historical fact and utterly beyond their control makes no sense; doing so by measuring employment outcomes arising out of the largest economic downturn since the Great Depression is shocking.

9.     Further, the regulations are premised on incomplete and unreliable data and create arbitrary formulas that lack any foundation in the record or economics.  The regulations are further arbitrary because they deny schools adequate procedural protections, enabling the Department to deprive schools of financial aid eligibility on the basis of data schools are not permitted to review, and calculations schools are, by and large, not permitted to challenge.

10.     In addition, the Department has not lived up to its basic obligation under the APA to provide interested parties with notice of its proposed regulations and the opportunity to comment on them.  For example, the final Gainful Employment regulations include a new regime of severe sanctions that was not even hinted at in the proposed regulations.

11.     Like the Gainful Employment regulations, the Program Approval and Reporting and Disclosure regulations are beyond the Department's statutory authority and are arbitrary and capricious in numerous respects.   In particular, in the Program Approval regulations, the Department has asserted, without any foundation in the HEA, the authority to preempt institutions' decisions about which types of programs prospective students will find useful to their career aspirations.  Moreover, the Department deprived regulated entities of their rights to notice and the opportunity to comment on the final Program Approval regulations by adopting final regulations that bear only a superficial resemblance, at best, to those the Department originally proposed.  Finally, the Reporting and Disclosure regulations impose several disclosure obligations on schools that find no basis in the HEA.

12.     Due to these legal deficiencies, both procedural and substantive, the Department's regulations have encountered strong criticism from the regulated community and other stakeholders, as well as bipartisan congressional opposition.  In fact, 289 Members of the House of Representatives—231 Republicans and 58 Democrats—voted in February 2011 to deny the Department any funds to implement the Gainful Employment regulations.  *See* House Roll Call Vote 92, H.R. 1 (Feb. 18, 2011) (adopted in the Committee of the Whole by a vote of 289-136).

13.     For the reasons set forth herein, the Court should declare the Gainful Employment, Program Approval, and Reporting and Disclosure regulations unlawful, vacate the regulations, and remand them to the Department.

## PARTIES

14.     Plaintiff APSCU is a voluntary association of private sector educational institutions, incorporated under the provisions of the District of Columbia Non-Profit Corporation Act, D.C. Code Ann. §§ 29-301.01-.114, with its principal place of business at 1101 Connecticut Avenue, NW, Suite 900, Washington, DC 20036.  APSCU represents more than 1,500 accredited, private postsecondary schools, institutes, colleges, and universities that annually provide educational opportunities to prepare more than 1.5 million students for employment in over 200 occupational fields.  APSCU's members qualify as "institutions of higher education," 20 U.S.C. § 1002(a)(1), (b), eligible to participate in student-aid programs under Title IV of the HEA, 20 U.S.C. §§ 1070-1099d.  Virtually all of APSCU's member schools will be—or already are—directly subject to the new requirements in the Gainful Employment, Program Approval, and Reporting and Disclosure regulations.  Those schools face additional regulatory burdens and increased regulatory compliance costs as a result of the Department's promulgation of the challenged regulations.  The regulations force schools to alter their admissions policies and the programs that they offer, causing irreparable changes in the make-up of their student bodies and limiting—and potentially eliminating—higher education opportunities for the traditionally underserved groups that are the most likely to fail the Department's arbitrary tests.  Those injuries are directly and immediately traceable to the challenged regulations and would be remedied by a judgment vacating the challenged regulations.  The interests that APSCU seeks to protect in filing this lawsuit on behalf of its members are germane to its organizational purposes to promote access to career education and to emphasize the importance of workforce development.  Neither the claims asserted nor the relief requested in this lawsuit requires the participation of individual APSCU members.

15.     Defendant Arne Duncan is the Secretary of the Department of Education.  His official address is 400 Maryland Avenue, SW, Washington, DC 20202.  He is being sued in his official capacity.  In that capacity, Secretary Duncan has overall responsibility for the operation and management of the Department.  Secretary Duncan, in his official capacity, is therefore responsible for the Department's promulgation of the challenged regulations and for related acts and omissions alleged herein.

16.     Defendant Department of Education is, and was at all times relevant hereto, an executive agency of the United States Government, 5 U.S.C. §§ 101, 105, subject to the APA, *id.* § 551(1).  The Department, in its current form, was created by the Department of Education Organization Act of 1979, 20 U.S.C. § 3401 *et seq.*, Pub. L. No. 96-88, 93 Stat. 668.  The Department is headquartered at 400 Maryland Avenue, SW, Washington, DC 20202.

17.     APSCU has also challenged other regulations that are part of the Department's recent regulatory overhaul.  On January 21, 2011, APSCU filed a complaint in the United States District Court for the District of Columbia (No. 1:11-cv-00138) against the same defendants in this lawsuit, which challenged on constitutional and statutory grounds the Department's adoption of regulations governing compensation for persons engaged in student recruiting and admissions; regulations governing substantial misrepresentations by schools regarding, among other things, their educational programs; and regulations requiring particular forms of state authorization as a prerequisite for participating in Title IV programs.  On July 12, 2011, the District Court granted in part and denied in part APSCU's motion for summary judgment and granted in part and denied in part Defendants' motion to dismiss, or in the alternative, motion for summary judgment.  APSCU filed a notice of appeal on July 15, 2011, and the appeal is currently pending before the United States Court of Appeals for the District of Columbia Circuit.

## JURISDICTION AND VENUE

18.     This action arises under the Constitution of the United States, the HEA, the General Education Provisions Act ("GEPA"), and the APA.  This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331.  The Court is authorized to issue the non-monetary relief sought herein pursuant to 5 U.S.C. §§ 702, 705, and 706.

19.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1), (2), and (3) because this is an action against officers and agencies of the United States; Defendant Department of Education resides in this judicial district; Defendant Secretary Duncan performs his official duties in this judicial district; a substantial part of the events or omissions giving rise to this action occurred in this judicial district; and Plaintiff resides in this judicial district and no real property is involved in the action.

## FACTUAL ALLEGATIONS

### I.     THE ROLE OF PRIVATE SECTOR SCHOOLS.

20.     As the Department has acknowledged, private sector educational institutions have "long played an important role in the nation's system of postsecondary education," 75 Fed. Reg. at 66,671, and are "a diverse, innovative, and fast-growing group of institutions," 76 Fed. Reg. at 34,386.

21.     Private sector education expanded primarily to satisfy the educational needs of non-traditional students—low-income, first-generation, working-adult, and single-parent students—needs that public and other private schools had been unable or unwilling to meet.  For example, among the students attending private sector schools:  76 percent live independently without parental support, 63 percent are over 24 years old, 54 percent delayed postsecondary education after high school, 46 percent have parents who did not go to school beyond high school, 47 percent have dependent children, 40 percent are minorities, and 31 percent are single

parents. Each year, hundreds of thousands of students enroll in programs offered by private sector schools to prepare for and to advance their careers and to improve the quality of life for themselves and for their families. Although their reasons vary, students are often attracted by private sector schools' flexible, innovative, and market-driven programs.

22.     Private sector schools enroll students in a full range of educational programs: masters and doctoral programs, two- and four-year associate- and baccalaureate-degree programs, and shorter term certificate and diploma programs. Over the last decade, private sector schools have accounted for close to 30 percent of certificates and associate's degrees awarded in this country, and approximately half of the technically trained workers who enter the American workforce each year are educated at private sector schools. Private sector schools also meet an increased demand for retraining displaced workers and upgrading skills for a wide variety of public and private employers.

23.     Notably, graduation rates are substantially higher at two-year private sector schools than at two-year public sector schools even though, compared to their public and non-profit counterparts, private sector schools' student populations are weighted more heavily toward non-traditional students who are, historically, less likely to graduate.

24.     APSCU's members are also indispensable in providing the postsecondary educational opportunities necessary to satisfy the nation's rapidly growing need for a highly educated workforce that can compete in a globalized economy. As the Secretary has recognized, President Obama's declared goal that the United States have the highest percentage of college graduates in the world by 2020 "cannot be achieved without a healthy and productive higher education for-profit sector." 75 Fed. Reg. 43,616, 43,617 (July 26, 2010). Achieving the President's goal will require that approximately 8 million new students—including millions of

non-traditional students—graduate from college over the next decade.  Private sector schools
have the required infrastructure—both brick-and-mortar facilities and online capacity—to cater
to the educational needs of millions of students.  In fact, private sector schools, which consume
far fewer taxpayer dollars than their public and non-profit counterparts, are investing their own
funds to contribute to the necessary expansion of the nation's postsecondary educational
opportunities; and private sector schools are increasing their capacity at higher rates than their
public sector counterparts.  Without the diverse, innovative, and agile educational programs
offered by private sector schools to help meet rising demand, it will be exceedingly difficult, and
perhaps impossible, to meet the President's goal.

## II.    THE STATUTORY FRAMEWORK.

### A.    Congressional Regulation Of Higher Education Funding.

25.      Each year, millions of students pursue postsecondary educational opportunities,
including those offered by private sector schools, using federal financial aid administered by the
Department of Education under Title IV of the HEA, 20 U.S.C. §§ 1070-1099d.  In Title IV,
Congress established a detailed and comprehensive statutory framework for determining
eligibility for that financial aid.

26.      Under Title IV, federal funds are available for use only at an "institution of higher
education."  As relevant here, an "institution of higher education" includes "a proprietary
institution of higher education."  20 U.S.C. § 1002(a)(1)(A).  A "proprietary institution of higher
education" is further defined to include only schools that (among other things) "provide[] an
eligible program of training to prepare students for gainful employment in a recognized
occupation," or provide a program at a regionally accredited institution that leads to a
baccalaureate degree in liberal arts and that has been in existence since January 1, 2009.  *Id.*
§ 1002(b)(1)(A).

27.     In addition to imposing these threshold requirements, the HEA requires
institutions to enter into "program participation agreement[s] with the Secretary" that condition
initial and continuing Title IV eligibility upon, among other things, a requirement that private
sector schools not derive more than 90 percent of their revenues from federal financial aid. *See
id.* § 1094(a)(24) (the "90/10 rule").

**B.      Congressional Regulation Of Student Debt.**

28.     Congress has enacted several eligibility requirements that specifically address
student debt and the cost of attending postsecondary educational institutions.

29.     Of critical importance here, the HEA specifies that postsecondary institutions may
not participate in Title IV programs if their students' federal loan default rates exceed certain
specified limits. Those default rates—known as "Cohort Default Rates" or "CDRs"—measure
the percentage of an institution's students' loans that have defaulted within a certain period of
time after the loans first entered repayment. *See, e.g.,* 20 U.S.C. § 1085(m)(1) (Federal Family
Education Loan ("FFEL") program); *id.* § 1087bb(g)(1) (Perkins loan program).[1]  Currently, an
institution's CDR for any given year is calculated based on the percentage of its students' loans
that have defaulted within two years of entering repayment. If an institution has CDRs that are
equal to or greater than 25 percent for three consecutive fiscal years, it "shall not be eligible to
participate" in specified financial aid programs "for the fiscal year for which the determination is
made and for the two succeeding fiscal years." *Id.* § 1085(a)(2) (FFEL eligibility); *see also id.*
§ 1070a(j)(1) (Pell Grant eligibility); *id.* § 1087c(d) (William D. Ford Federal Direct Loan
("Direct Loan") eligibility). In 2008, Congress altered the CDR calculation. *See* Higher

---

[1]     The FFEL program has been terminated by Congress, and no new FFEL loans may be
disbursed. *See* Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152,
§ 2201, 124 Stat. 1029, 1074. But the eligibility provisions for other programs cross-reference
and still rely upon the FFEL CDR provision.

Education Opportunity Act ("HEOA") of 2008, Pub. L. No. 110-315, 122 Stat. 3078. Beginning in 2012, an institution's CDR for any given year will be calculated based on the percentage of its students' loans that have defaulted within three years of entering repayment, and beginning in 2014, institutions with CDRs equal to or greater than 30 percent for each of the three most recent fiscal years will not be eligible to participate in specified financial aid programs. *Id.*

30.     In addition, each of the individual federal-assistance programs imposes a cap on the amount of money that can be borrowed each year and in the aggregate by a single student. *See, e.g.*, 20 U.S.C. § 1078(b)(1)(A)-(B) (FFEL program); *id.* § 1078-8(d)(2)-(4) (unsubsidized Stafford loan program); *id.* § 1087dd(a)(2)(A)-(B) (Perkins loan program).

31.     Congress has also taken other specific, measured steps designed to address student debt burdens. The HEA provides debt relief for individual borrowers in the form of forbearance and repayment programs. Most recently, Congress created the income-based repayment program, which caps monthly loan payments at a percentage of the borrower's income during periods of financial hardship. *See* College Cost Reduction and Access Act of 2007, Pub. L. No. 110-84, § 493C, 121 Stat. 784, 792-95 (codified at 20 U.S.C. § 1098e). Individual loan programs similarly permit individualized debt relief options. In the Direct Loan program, for example, Congress outlined five potential repayment plans for student borrowers. *See* 20 U.S.C. § 1087e(d). Congress also requires that schools provide debt management education to their students. *See, e.g.*, *id.* § 1092(b)(1)(A). In addition, Congress mandates extensive disclosure of education costs to "allow[] parents and students to make informed decisions" about the costs of attending college. *See id.* § 1015(b).

32.     Notably, however, Congress and the Department have strictly limited schools' ability to control student debt. For example, Department regulations require that schools inform

students of the maximum amount of federal debt they can incur. 34 C.F.R. § 685.301(a)(3)(i).

At the same time, federal law generally forbids schools from restricting student borrowing to the

amount needed to cover tuition and fees, 20 U.S.C. § 1087tt(c); 34 C.F.R. § 685.301(a)(8); *see*

*also* Dep't of Educ., *2010-2011 Federal Student Aid Handbook*, 3-100, and counts federal

student loans paid for by schools in any part as defaulted loans for purposes of CDR calculations,

20 U.S.C. § 1085(m)(2)(B); 34 C.F.R. § 668.183(c)(iii).

### C.    Congressional Regulation Of Educational Program Requirements.

33.     The HEA imposes only very limited program—as opposed to institutional—

eligibility requirements. The HEA defines several types of eligible programs. 20 U.S.C.

§ 1088(b). For example, programs that provide at least 600 clock hours, 16 semester hours, or

24 quarter hours of instruction and that admit only students who have not completed the

equivalent of an associate's degree must "provid[e] a program of training to prepare students for

gainful employment in a recognized profession." *See id.* § 1088(b)(1). Other eligibility criteria

apply to shorter programs and programs that require the equivalent of an associate's degree for

admission, and graduate and professional programs.

34.     Further, Congress has expressly declared that the Department may not exercise

any control, authority, and influence over the curriculum or administration of educational

institutions. *See id.* § 1232a. The House Committee that oversees the Department has

recognized that Congress has dictated a limited role for the federal government in this area, and

in particular, has explained that the Department "does not currently have the authority to dictate

tuition and fee rates for institutions of higher education." H.R. Rep. No. 109-231, at 159 (2005).

### III.   THE DEPARTMENT'S FLAWED AND TAINTED RULEMAKING PROCESS.

35.     This was not a normal rulemaking: the regulatory process was marked by well-substantiated allegations of bias and misconduct and assertions that the Department lacked statutory authority to issue the challenged regulations.  These concerns have led to a number of investigations, including an ongoing inquiry by the Department's Inspector General, referrals to the SEC and U.S. Attorney for the Southern District of New York, requests for congressional investigations, and substantial revisions to a GAO report relied upon by the Department to justify the challenged regulations.

### A.   The Department's Flawed Negotiated Rulemaking.

36.     On May 26, 2009, the Department published a notice in the *Federal Register* of its intention to establish a negotiated rulemaking committee, as required by 20 U.S.C. § 1098a, to develop new regulations regarding Title IV eligibility.  *See also* Negotiated Rulemaking Act, 5 U.S.C. §§ 561-570a.  Under 20 U.S.C. § 1098a, unless impracticable, unnecessary, or contrary to the public interest, the Department must subject all regulations pertaining to student financial aid programs to public negotiated rulemaking sessions before publishing any proposed regulations.  By requiring such negotiations, Congress intended to guide the Department to produce final regulations that are workable and free of significant conflict.  On September 9, 2009, the Department established a committee to develop new Title IV regulations.  *See* 74 Fed. Reg. 46,399.

37.     A number of the issues to be considered by the negotiated rulemaking committee—including issues regarding compensation for school employees engaged in recruiting and admissions and defining the statutory phrase "gainful employment in a recognized" occupation—were of unique importance to private sector institutions.  Yet, of the 16

non-federal primary negotiators permitted to participate in the sessions, only one represented private sector institutions. *See* Team I—Program Integrity Issues, List of Negotiators, http://www2.ed.gov/policy/highered/reg/hearulemaking/2009/2009-2/team-one-negotiators.pdf. Private sector schools requested additional representation, but those requests were rejected. In short, the regulatory process was flawed from the start.

38.    The Department held three negotiated rulemaking sessions:  November 2-6, 2009, December 7-11, 2009, and January 25-29, 2010.  Notably, the Department short-circuited adequate debate on its gainful employment proposal by failing to even provide proposed regulatory language to the committee until the final negotiating session. *See* Session Two, Issue Summaries, Issue Paper # 6, http://www2.ed.gov/policy/highered/reg/hearulemaking/2009/integrity.html ("We are not providing regulatory language at this time.").

39.    Unsurprisingly under these circumstances, the negotiated-rulemaking committee failed to achieve consensus in several areas, including the gainful employment rules and the associated new program approval requirements.

### B.    The Department's Inadequate Notice And Comment Rulemaking Process.

40.    Two separate Notices of Proposed Rulemaking ("NPRMs") emerged out of the Department's decision to abandon negotiated rulemaking:  one, published on July 26, 2010, contained proposed Gainful Employment and new Program Approval regulations, 75 Fed. Reg. at 43,616, and the other, published earlier on June 18, 2010, contained proposed Reporting and Disclosure regulations, 75 Fed. Reg. 34,806.

41.    For each of these substantial NPRMs, the Department provided for abbreviated, 45-day comment periods instead of the standard 60-day periods. *See* Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993); *see also* Exec. Order No. 13,563, 76 Fed. Reg. 3,821, 3,821-

22 (Jan. 18, 2011).  Nevertheless, a record number of commenters, more than 90,000, submitted comments on the proposed regulations.

42.     Several commenters, including APSCU, submitted detailed comments to the Department explaining the myriad legal and other problems with each of the proposed regulations.  *See, e.g.*, *Comments of the Career College Association*, Docket ED-2010-OPE-0004 (Aug. 2, 2010); *Comments of the Career College Association*, Docket ED-2010-OPE-0012 (Sept. 9, 2010).

43.     Notably, several Members of Congress also submitted comments to the Department expressing disapproval of the Department's proposed regulations.  These comments were amplified on February 18, 2011—before the Department published the final Gainful Employment regulations—when a large bipartisan majority of the House of Representatives approved an amendment to the Full-Year Continuing Appropriations Act, 2011 that would have prevented the Department from using any appropriated funds to promulgate or enforce the proposed regulations.

44.     On June 13, 2011, the Department published the Gainful Employment regulations as a final rule with an effective date of July 1, 2012.  76 Fed. Reg. 34,386.  On October 29, 2010, the Department published the Program Approval regulations as final regulations with an effective date of July 1, 2011.  75 Fed. Reg. 66,665.  The Department also published the Reporting and Disclosure regulations on October 29, 2010, also with an effective date of July 1, 2011.  75 Fed. Reg. 66,832.

45.     Although the final regulations differ—sometimes significantly—from the original proposals, these changes did not address the serious legal defects that commenters identified in each of the regulations.  Indeed, in some instances, the changes introduced new legal defects.

For example, the final regulations are not "logical outgrowths" of the proposed regulations because many of their provisions were not included in the proposed regulations.

46.    Notably, the Department justified the final Reporting and Disclosure and Gainful Employment regulations, in part, on evidence of problems in the private sector set forth in a GAO report that has been discredited. *See* 75 Fed. Reg. at 66,843; 76 Fed. Reg. at 34,392, 34,455-56; *see also For-Profit Colleges: Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Deceptive and Questionable Marketing Practices*, Aug. 4, 2010.  On November 30, 2010, the GAO published a revised report that contained fifteen corrections, each of which revealed an error that had cast private sector schools in an unjustifiably unfavorable light.  Nick Anderson, *GAO Revises Its Report Critical of Practices at For-Profit Schools*, Wash. Post, Dec. 7, 2010, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2010/12/07/AR2010120706803.html.  Shortly after the publication of the revised report, the GAO restructured its investigative unit and reassigned personnel, which included removing the lead author of the original report from his position. *See* Jonathan Strong, *GAO Replaces Top Official Behind Error-Riddled Report on For-Profit Colleges*, The Daily Caller, Mar. 3, 2011, *available at* http://dailycaller.com/2011/03/03/gao-replaces-top-official-behind-error-riddled-report-on-for-profit-colleges/print/.  It has recently been reported that the GAO was put under political pressure by agenda-driven congressional staffers and "extreme short time frames" in drafting the report, which led to its many inaccuracies. *See* Jonathan Strong, *Political Pressure Tainted Error-Ridden GAO Report*, The Daily Caller, May 17, 2011, *available at* http://dailycaller.com/2011/05/17/political-pressure-tainted-error-ridden-gao-report/.

**C.    The Department's Consideration Of The Regulations Was Tainted.**

47.    It is clear that the Department's rulemaking was tainted.  The Department had a pre-determined agenda to target private sector education.  Documents produced through the

Freedom of Information Act ("FOIA") reveal that the Department in pursuit of that agenda, and after a perfunctory negotiated rulemaking process, cut private sector schools out of the discussion and turned instead, remarkably, to short sellers—Wall Street investors with a pecuniary interest in the decline of the sector—and non-profit groups with a history of animosity toward the sector.  The influence of these short sellers and advocacy groups can be seen in the unfair and unworkable regulations adopted by the Department.

48.     In fact, the public record assembled through FOIA requests reveals more than 100 communications and several in-person meetings between Department officials and short sellers, including discussions of the potential effects of new Gainful Employment regulations on stock prices of publicly traded private sector schools.

49.     In light of this record, the Department has since conceded that "at least one short seller probably should have been banned from the meetings [with Department officials] because of his ties to Wall Street and community college officials who were involved in the rulemaking." Juila Edwards & Fawn Johnson, *Short-Selling Questions Raised on For-Profit College Rules*, Nat'l J. Daily A.M., Feb. 9, 2011.

50.     FOIA documents further demonstrate that early on Department officials adopted a mentality that prevented them from engaging in an even-handed rulemaking process.  For example, in May 2009, the Department organized two conference calls with various stakeholder groups regarding its regulatory objectives.  One call was held with representatives of private sector schools and the Department published a transcript of that call on its website. *See* Conference Call with Robert Shireman, Deputy Undersecretary, Dep't of Educ. (May 29, 2009), http://www2.ed.gov/policy/highered/reg/hearulemaking/2009/call-career-colleges.pdf.  The other call was referred to in Department communications as the "friends/non-profits" call, and private

sector schools were not invited to participate.  The Department never published a transcript of that call.

51.     The irregularities in the rulemaking process have spurred requests for investigations—efforts that remain ongoing.

52.     On November 17, 2010, Senators Richard Burr and Tom Coburn wrote to the Department's Inspector General, Kathleen Tighe, referring to the Department's collaboration with short sellers and noting that "it appears [that] Department officials may have leaked information to outside organizations, some of whom may stand to financially benefit from the failure of the proprietary school sector."  Letter from Sens. Richard Burr and Tom A. Coburn to Kathleen Tighe, *available at* http://www.scribd.com/doc/54549531/Letter-from-Senator-Richard-Burr-Senator-Tom-Coburn-DOE-Inspector-Kathleen-Tighe-re-Gainful-Employment-11-17-2010.  The Senators called upon the Inspector General to investigate this situation.  *See also Preventing Abuse of the Military's Tuition Assistance Program:  Hearing Before the S. Homeland Sec. & Governmental Affairs Subcomm. on Fed. Fin. Mgmt., Gov't Info., Fed. Servs., & Int'l Sec*, CQ Transcripts, Mar. 2, 2011 (Senator Tom Coburn, noting that if these allegations are true some people in the Department "ought to be going to jail").

53.     The Inspector General has since confirmed that an investigation is ongoing.  *See* Peter Schroder, *Audit to Determine Whether College Reg Was Leaked to Wall Street*, The Hill, June 13, 2011, *available at* http://thehill.com/blogs/on-the-money/banking-financial-institutions/166087-dept-of-education-ig-looking-into-wall-street; *see also* Letter from Sen. Joseph I. Lieberman to Sec'y Arne Duncan, Apr. 27, 2011, *available at* http://www.scribd.com/doc/54549537/Letter-from-Senator-Joseph-Lieberman-Arne-Duncan-DOE-re-Gainful-Employment-Regulation-04-27-2011 ("I understand the [Department's] Inspector General is looking into

[these] allegation[s], and ask that you inform me of the outcome of that investigation."). The Inspector General has also publicly stated that "[i]f [her office] came to believe that insiders had traded on confidential information, we could refer it [to the SEC]." Schroder, *supra.*

54.     On March 1, 2011, Citizens for Responsibility and Ethics in Washington ("CREW"), asked the SEC to investigate any market manipulation by short sellers who were in contact with the Department throughout the rulemaking. *See* Letter from Anne L. Weismann, Chief Counsel, CREW, to Robert Khuzami, Director of Enforcement, SEC, *available at* http://www.scribd.com/doc/49782567/Letter-to-Robert-Khuzami-CREW-SEC-New-Information-About-Short-Sellers-Efforts-to-Shape-Education-Regulations-3-1-11.

55.     On April 28, 2011, Senator Michael Enzi wrote to Secretary Duncan to express his concern about documents that "indicate that several investors contacted the Department and met with officials involved in the development of the proposed rule while the rulemaking process was ongoing," and "suggest that non-profit groups advocating in support of the Department's proposed rule were in regular contact with Department officials, as well as investors interested in the outcome of the rulemaking." Letter from Sen. Michael B. Enzi to Sec'y Arne Duncan, Apr. 28, 2011, *available at* http://help.senate.gov/imo/media/doc/4-28-11%20-%20EnziLetter%20-%20GEDocuments.pdf.  Days later, Senator Enzi wrote to Robert Khuzami, Director of Enforcement at the SEC, and Preet Bharara, U.S. Attorney for the Southern District of New York, to "direct [their] attention" to these issues and asked them to "review [the] materials to determine if further action by [their offices] is warranted." Letter from Sen. Michael B. Enzi to Robert Khuzami, May 2, 2011, *available at* http://www.scribd.com/doc/54549543/Letter-from-Senator-Mike-Enzi-Robert-Khuzami-SEC-re-DOE-investor-communication-05-02-2011; Letter from Sen. Michael B. Enzi to Preet Bharara, May 2, 2011, *available at* http://www.scribd.com/

doc/54549543/Letter-from-Senator-Mike-Enzi-Robert-Khuzami-SEC-re-DOE-investor-communication-05-02-2011.

56.     On May 24, 2011, Representative Edolphus Towns wrote a letter to Representative Darrell Issa, Chairman of the House Committee on Oversight and Government Reform, to ask him to "initiate an investigation . . . concerning the process by which senior officials at the Department of Education . . . drafted the proposed 'Gainful Employment'" regulation.  Letter from Rep. Edolphus Towns to Chairman Darrell E. Issa, *available at* http://dailycaller.com/wp-content/uploads/2011/06/GE-letter-to-Issa-and-Cummings.pdf.  In that letter, Representative Towns noted, among other things, serious allegations that the Department "allegedly drafted the [Gainful Employment] regulation with a predetermined agenda to harm career colleges" and "secretly held meetings with known short-sellers who stand to profit substantially by the [Gainful Employment] regulation."  *Id.*  Chairman Issa held a hearing on the Gainful Employment regulations on July 8, 2011.

## IV.     THE CHALLENGED REGULATIONS.

### A.     The Gainful Employment Regulations.

57.     The Gainful Employment regulations impose dramatic new student debt limitations on programs of proprietary institutions of higher education based on an unprecedented and strained interpretation of the statutory phrase "gainful employment" found in 20 U.S.C. §§ 1001, 1002, and 1088.

58.     Indeed, Congress incorporated the "gainful employment" phrase into the HEA in 1965, but the Department has never before promulgated regulations purporting to define that short, commonly used phrase.  In adjudications, however, the Department had given the term some content by concluding that programs that teach, for example, cultural values rather than employable skills do not satisfy the gainful employment requirement.  But the Department never

inquired into student income, debt levels, or loan repayment rates to measure "gainful employment."

59.     That all will change under the Gainful Employment regulations:  the Department has declared that it will "assess whether a program provides training that leads to gainful employment by applying two tests:  One test based upon debt-to-earnings ratios and the other test based upon repayment rates."  75 Fed. Reg. at 43,618; *see also* 76 Fed. Reg. at 34,450 (to be codified at 34 C.F.R. § 668.7) [hereinafter 34 C.F.R. § 668.7].

### 1.     The Debt-To-Earnings And Loan Repayment Rate Tests.

60.     The *debt-to-earnings test* evaluates the ratio of (i) the estimated annual loan payment owed by students who graduated from a program to (ii) either the average annual earnings or discretionary income of those graduates. *See* 34 C.F.R. § 668.7(c)(1).  This complex calculation requires three steps:  *First*, the Department generally calculates the median loan debt of students who completed the program during the two-year period consisting of the third and fourth fiscal years prior to the most recently concluded fiscal year. *Id.* § 668.7(c)(2)(i); *id* § 668.7(a)(2)(iv)-(v).  *Second*, the Department computes an estimated annual payment from the median loan debt statistic by making two assumptions:  (i) that the median loan debt of the *past* graduates is subject to "the current annual interest rate on Federal Direct Unsubsidized Loans," and (ii) that the median loan debt is being repaid on a 10-year, 15-year, or 20-year schedule depending on whether the program is a certificate or associate's degree program, a bachelor's or master's degree program, or a doctoral or first-professional degree program, respectively. *Id.* § 668.7(c)(2)(ii).  Both federal and private loans are taken into account. *See id.* § 668.7(c)(4)(i). *Third*, the estimated annual loan payment is divided by two earnings formulas: (i) the mean (or median, whichever is higher) annual earnings for the same cohort of former students and (ii) the "discretionary income" for the same cohort or graduation year of former students, which is the

amount of annual earnings in excess of 150 percent of the Poverty Guidelines established by the Department of Health and Human Services for the relevant year. *See id.* § 668.7(c)(1).

61.     The Department does not itself compute the mean and median earnings of a program's former students in the third step. Rather, "[t]he Secretary obtains from the Social Security Administration (SSA), or another Federal agency, the most currently available mean and median annual earnings." *Id.* § 668.7(c)(3). Notably, a school "may not challenge the accuracy of the mean or median annual earnings the Secretary obtained from SSA to calculate the draft debt-to-earnings ratios for the program." *Id.* § 668.7(e)(1)(iv).

62.     The regulations purportedly allow institutions to use alternative earning figures to attempt to satisfy the debt-to-earnings ratios: schools may rely on "alternative earnings from: a State-sponsored data system; an institutional survey conducted in accordance with [National Center for Education Statistics] standards; or, for FYs 2012, 2013, and 2014, the Bureau of Labor Statistics (BLS)." *Id.* § 668.7(g). In practice, however, it will be impractical for schools to rely on State-sponsored or survey data. Moreover, if schools use BLS data during those first three years, they "must use BLS earnings at no higher than the 25th percentile," *id.* § 668.7(g)(4)(ii), that is, the bottom quartile of salaries.

63.     The *loan repayment rate test* turns on the percentage of loans (by dollar value) that have either been paid off in full or had their outstanding balance reduced during the course of a fiscal year. *Id.* § 668.7(b). Loans for students who enrolled in a program but did not graduate are included in the calculation. *Id.* Students whose payment obligations are deferred for reasons other than being in school or in the military are counted against programs' repayment rates, *see id.* § 668.7(b)(4), as are students whose loans are in forbearance. Only three percent of loans for borrowers in the income-based repayment plan or the income-contingent repayment

plan may be excluded—even if those borrowers are fully meeting their repayment obligations. *See id.* § 668.7(b)(3)(i)(C)(1).

64.     The calculations for these tests are generally made using data for students who graduated or entered repayment in the *two*-year period usually consisting of the third and fourth fiscal years prior to the most recently concluded fiscal year—which the regulations define as "2YP." *Id.* § 668.7(a)(2)(iv).  For programs whose students are required to complete a medical or dental internship or residency, the tests use data for students who graduated or entered repayment in the sixth and seventh fiscal years prior to the most recently concluded fiscal year ("2YP-R").  *Id.*  For fiscal years 2012, 2013, and 2014, the Department will also calculate loan repayment rates using data for students who entered repayment in the first and second fiscal years prior to the most recently concluded fiscal year ("2YP-A").  *See id.* § 668.7(a)(2)(iv), (b)(1)(iv).  If there are 30 or fewer students who graduated from a program or entered repayment during 2YP or 2YP-R, then the calculations are made using data for students who graduated or entered repayment during a *four*-year period usually consisting of the third, fourth, fifth, and sixth fiscal years prior to the most recently concluded fiscal year ("4YP").  *See id.* § 668.7(a)(v), (d)(1).  For programs whose students are required to complete a medical or dental internship or residency, this four-year period is calculated using data for students who graduated or entered repayment in the sixth, seventh, eighth, and ninth fiscal years prior to the most recently concluded fiscal year.  *See id.* § 668.7(a)(v), (d)(1).

65.     Under the final rules, an educational program is deemed to "lead[] to gainful employment in a recognized occupation" only if the relevant student cohort has (i) a loan repayment rate of at least 35 percent; or (ii) a debt-to-earnings ratio of 12 percent or less, or a debt-to-discretionary income ratio of 30 percent or less; or (iii) the data necessary to compute

(i) and (ii) are not available.  *Id.* § 668.7(a)(i)-(iii); *see also id.* § 668.7(d)(2).  Strikingly, as at

least one commentator explained, "11.8 percent of non-profit colleges and 19.3 percent of public

colleges (including 27.3 percent of community colleges) have loan repayment rates below" the

proposed regulations' 35 percent threshold, which is calculated in a substantially similar way to

the 35 percent threshold in the final regulations.  *See Comment of ITT Educational Services, Inc.*,

Docket ED-2010-OPE-0012, at 50 (Sept. 9, 2010).  Indeed, even elite medical schools, including

Harvard Medical School and Tulane University's medical school, would not have satisfied the

Department's repayment rate test as proposed.  *Id.*

### 2.    Sanctions Under The Gainful Employment Regulations.

66.    Programs that fail to satisfy at least one of the Department's new gainful

employment tests are subject to a variety of mandatory sanctions.  The final regulations create a

wholly new framework—which was never subject to notice and comment—whereby

increasingly severe penalties are imposed for each year in which a program does not satisfy the

Department's tests.

67.    After the first year that a program does not satisfy both of the Department's

"gainful employment" tests, the Department labels that program as "failing."  34 C.F.R.

§ 668.7(h).  Schools with failing programs must communicate to "each enrolled and prospective

student [in the program] a warning" that (1) "[e]xplains the debt measures and shows the amount

by which the program did not meet the minimum standards" and (2) "[d]escribes any actions the

institution plans to take to improve the program's performance under the debt measures."  *Id.*

§ 668.7(j)(1)(A)-(B).  Obviously, such compulsory statements are designed to scare off

prospective students.

68.    If a program does not satisfy both of the Department's tests for a second time

within a three-year window, the school is compelled to provide several warnings to the

program's current and prospective students, including: (i) an "explanation of the actions the institution plans to take in response to the second failure" and the timeline for discontinuing the program, if that is what the institution elects to do, and "the options available to the student"; (ii) an "explanation of the risks associated with enrolling or continuing in the program, including the potential consequences for, and options available to, the student if the program becomes ineligible"; (iii) an "explanation of the resources available, including www.collegenavigator.gov, that the student may use to research other educational options and compare program costs"; and (iv) a "clear and conspicuous statement that a student who enrolls or continues in the program *should expect* to have difficulty repaying his or her student loans." *Id.* § 668.7(j)(2) (emphasis added).

69.     Finally, if a program does not meet the Department's tests for three out of the four most recent fiscal years, the program is declared "ineligible" and the school "may no longer disburse [T]itle IV, HEA program funds to students enrolled in that program except as permitted using the procedures in" the Department's regulations governing the end of programs' participation in Title IV of the HEA. *Id.* § 668.7(i). For programs that would become ineligible based on debt measures for fiscal years 2012, 2013, and 2014, the regulations cap at five percent (by student population) the total number of programs that can be found ineligible. *See id.* § 668.7(k).

70.     The final regulations also impose "wait out" periods on certain programs that were not part of the proposed rules. *Id.* § 668.7(*l*). If the Department determines that a program is "ineligible" under the debt tests, the offering institution is barred from seeking to reestablish eligibility of the program—or of any "substantially similar" program—"until the end of the third [fiscal year] following the [one in which] the program became ineligible." *Id.* § 668.7(*l*)(2)(ii).

Similarly, if the Department determines that a program is "failing" under the debt tests and the offering institution thereafter voluntarily discontinues a program's participation in Title IV, the offering institution is barred from seeking to reestablish eligibility of the program—or of any "substantially similar" program—for at least two fiscal years. *Id.* (length of "wait out" period for voluntarily discontinued "failing" programs turns on timing of voluntary cessation of participation in Title IV).

71.    The NPRM did not mention or seek comment on any portion of the "wait out" period scheme the Department has adopted.

**B.    The Program Approval Regulations.**

72.    The Department's prior regulatory regime provided for only limited review of new educational programs offered by private sector schools. The proposed Program Approval regulations, however, would have dramatically increased the obligations on programs required to obtain approval from the Secretary before offering additional educational programs to "prepare students for gainful employment." *See* 34 C.F.R. § 668.7(g) (proposed).

73.    The proposed regulations would have required institutions to submit to the Department a great deal of information before being allowed to create a new Title IV-eligible program, including documentation from unaffiliated businesses. The Department proposed to somehow use that information to evaluate whether "the curriculum of the additional program aligns with recognized occupations at . . . employers' businesses" and whether "there are projected job vacancies or expected demand for those occupations at those businesses." *Id.* § 668.7(g)(1)(iii) (proposed). The proposed regulations, however, would have left in place the exceptions contained in 34 C.F.R. § 600.10(c)(2) (2010). That provision allowed new programs that "[l]ead[] to an associate, baccalaureate, professional, or graduate degree" or "[p]repare[] students for gainful employment in the same or related recognized occupation as an educational

program that has previously been designated as an eligible program at that institution by the Secretary" to be offered without additional approval from the Department.

74.     Rather than carefully consider the 90,000-plus comments received in response to its July 26, 2010 NPRM in a unified manner, the Department inexplicably rushed through the Program Approval regulations—adopting final regulations on October 29, 2010—while delaying release of the companion Gainful Employment regulations.  The final regulations the Department adopted differed substantially from those it proposed.

75.     Under the final regulations, institutions must notify the Department of their intention to offer *any* new program that prepares students for gainful employment in a recognized occupation at least 90 days before the first day of class.  34 C.F.R. § 600.10(c)(1). Accordingly, unlike the proposed regulations, the final regulations eliminated 34 C.F.R. § 600.10(c)(2) (2010), which exempted certain new programs from the approval process.  In addition, the final regulations significantly expand the scope of educational programs that qualify as new programs.  *See* 34 C.F.R. § 600.10(c)(2)(i)-(iii).

76.     The final regulations also require institutions to describe how they "determined the need for the program and how the program was designed to meet local market needs, or for an online program, regional or national market needs."  *Id.* § 600.20(d)(2)(i).  They also must describe how the program was "reviewed or approved by, or developed in conjunction with" certain third parties, such as outside committees, regulatory agencies, and "businesses that would likely employ graduates of the program."  *Id.* § 600.20(d)(2)(ii).  They also require schools to submit information that institutions do not currently collect—at least not in the format required by the Department—when deciding whether to offer new programs.

77.     Once an institution has provided timely notice, it "may proceed to offer the program . . . unless the Secretary advises the institution that the additional educational program must be approved under § 600.20(c)(1)(v)." *Id.* § 600.10(c)(1). The Department may decide for any reason—or for no reason at all—that the institution must get approval. The only limitation on this unbridled and exclusive discretion of the Department is one of timing: The Department must advise the institution that approval is required "at least 30 days before the first day of class." *Id.* § 600.20(d)(1)(ii)(B).

78.     If the Department decides that approval is necessary, the final regulations permit the Secretary to disapprove of programs based on vague and ambiguous criteria like "[w]hether the process and determination by the institution to offer an additional educational program . . . is sufficient," and whether the "educational program[] being added is inconsistent with the institution's historical program offerings, growth, and operations," *id.* § 600.20(d)(1)(ii)(E)(3), (4), that were absent from the proposed regulations.

### C.     The Reporting And Disclosure Regulations.

79.     The Reporting and Disclosure regulations, which "apply only to programs that prepare students for gainful employment," 75 Fed. Reg. at 66,835, require institutions offering those programs to report to the Department, among other things, "[t]he amounts [each] student [completing the program] received from private education loans and the amount from institutional financing plans that the student owes the institution upon completing the program." 34 C.F.R. § 668.6(a)(1)(i)(C)(2). The regulations further require institutions to provide prospective students with—again, among other things—"[t]he median loan debt incurred by students who completed the program," identifying separately "the median loan debt from [T]itle IV, HEA program loans, and the median loan debt from private educational loans and institutional finance plans." *Id.* § 668.6(b)(1)(V).

80.     Before adoption of the Reporting and Disclosure regulations the Department had not required institutions to report their students' *non-federal* loan information to the Department. Nor had the Department required institutions to disclose to prospective students the total loan debt of students completing their educational programs.

## V.    THE CHALLENGED REGULATIONS VIOLATE THE CONSTITUTION, ARE BEYOND THE DEPARTMENT'S AUTHORITY, AND VIOLATE THE ADMINISTRATIVE PROCEDURE ACT.

### A.    The Gainful Employment Regulations.

81.     The final Gainful Employment regulations employ tests and impose dramatic new student debt limitations on private sector and certain other schools that far exceed the Department's authority under the HEA, are in some respects unconstitutional, and are arbitrary and capricious in numerous ways.  Indeed the regulations are contrary to the very purpose of federal higher education funding—to provide access to higher education to students from all walks of life—because the regulations essentially incentivize private sector schools to curtail educational opportunities to low-income and non-traditional students who are the most likely to fail the Department's arbitrary debt-related tests.

### 1.     The Gainful Employment Regulations Are Beyond The Department's Authority Under The HEA.

82.     The Department's strained attempt to import its complex debt and income tests into a simple two-word phrase that has been in the HEA since 1965—"gainful employment"—is impermissible.

83.     The Department's convoluted interpretation of the statutory phrase "gainful employment" is contrary to the widely understood meaning of the phrase—simply, a job that pays.  Moreover, the word "gainful" modifies "employment"—not the entire process of embarking on a program of study, borrowing money to pay for it, and then obtaining a job.  It is not the "program of training," 20 U.S.C. § 1002(b)(1)(A)(i), that must be "gainful" or profitable.

Schools must offer courses that provide marketable skills; the HEA does not, however, make schools responsible for making sure their students have jobs four years after graduation that provide them a certain amount of disposable income.

84. The Department's interpretation of the HEA in the Gainful Employment regulations is also at odds with the normal rule of statutory construction that identical words used in different parts of the same Act are intended to have the same meaning. For example, Congress has used the phrase "gainful employment" at least *nine* times in Title 20 in a manner that is consistent with the term's plain meaning, not the Department's new definition of the term. Most notably, Congress has repeatedly used the phrase "gainful employment" to describe the type of employment that recipients of certain academic and research fellowships generally may *not* pursue for the duration of their fellowships. In each of those instances, Congress clearly meant to prohibit fellowship recipients from engaging in any paid employment—not simply employment that pays enough to satisfy specified debt-to-earnings and repayment-rate tests.

85. The Department's convoluted interpretation of the statutory phrase "gainful employment" is further undercut by Congress's repeated use of that phrase in other contexts. Congress has used the phrase "gainful employment"—or "gainfully employed"—in dozens of statutory provisions outside of Title 20. Yet, nowhere has Congress in any way suggested that the phrase is a placeholder for debt-amortization tests of any sort. To the contrary, injecting debt-related considerations into the various statutory frameworks enacted by Congress would lead to absurd results.

86. Notably, the Department's own regulation defining eligible programs makes clear that employment is "gainful" as long as it is paying—not paying enough in terms of some after-the-fact debt-related calculations. Section 668.8(e)(1)(ii) provides that certain kinds of programs

at proprietary institutions of higher education and postsecondary vocational institutions are eligible to participate in Title IV programs only if they have "a substantiated placement rate of at least 70 percent." *See also* 20 U.S.C. § 1088(b)(2)(A)(ii). To calculate this placement rate, an institution must "determine the number of students who, within 180 days of the day they received [a recognized educational credential], obtained *gainful employment* in the recognized occupation for which they were trained or in a related comparable recognized occupation." 34 C.F.R. § 668.8(g)(1)(ii) (emphasis added). For an institution to document that a graduate is gainfully employed under these regulations, it must only produce, among other acceptable documents, a "written statement from the student's employer," "[s]igned copies of State or Federal income tax forms," or "[w]ritten evidence of payments of Social Security taxes." *Id.* § 668.8(g)(2). The Gainful Employment regulations do not purport to alter these requirements.

87.     The Department's gainful employment analysis is also fatally flawed because it rests upon the erroneous premise that an educational program qualifies for federal funding only if it actually "*lead[s]* to gainful employment in a recognized occupation." 76 Fed. Reg. at 34,386-87 (emphasis added); 75 Fed. Reg. at 43,618; *see also* 75 Fed. Reg. at 66,677. But the statutes enacted by Congress impose no such requirement: The educational program that an institution of higher education offers must be intended merely "*to prepare* students for gainful employment." 20 U.S.C. § 1002(b)(1)(A)(i) (emphasis added). Institutions need not—nor could they— *guarantee* students that their programs will "lead to gainful employment" after graduation, whether measured by the Department's novel tests or any other metric. That is particularly true in an economic environment where students graduating from all institutions are facing historic levels of unemployment and grim job prospects. *See* Alejandra Cancino, *Recent College Graduates Earn Less than Those Who Graduated Before the Recession*, L.A. Times, May 20,

2011, *available at* http://articles.latimes.com/2011/may/20/business/la-fi-graduates-20110518 (noting a recent study "paints a grim picture for about 1.7 million students who are graduating this spring with a bachelor's degree. The graduates will face an unemployment rate hovering around 9% and an economy struggling to recover more than 8.8 million private-sector jobs lost during the recession.").

88.     The Department's interpretation of "gainful employment" is also inconsistent with the structure and purpose of the HEA.

89.     For example, the Department admits that "[e]*xisting Federal law* attempts to meet" the purported aims of its Gainful Employment regulations through other means, namely "the required disclosure by institutions of information to prospective and current students on a range of issues including[] cost of attendance, net price, graduation rates, and student financial aid." 76 Fed. Reg. at 34,454 (citing HEA §§ 132, 485) (emphasis added). The Department's contention, then, is that Congress did not do a good enough job. The Department, however, is not free to second-guess Congress.

90.     Further, the Department attempts to fashion a *program* eligibility requirement from what the HEA clearly sets forth as an *institutional* eligibility requirement. *See* 20 U.S.C. § 1002(b)(A)(i) (providing that a private sector institution is eligible to participate in Title IV programs if, among other things, it provides "*an* eligible program of training to prepare students for gainful employment in a recognized occupation" (emphasis added)); *see also* 76 Fed. Reg. at 34,392 (asserting that 20 U.S.C. § 1002's criteria for *institutional* eligibility set forth *program* eligibility standards).

91.     Notably, Congress has imposed numerous institutional eligibility requirements in the HEA, but it has nowhere imposed the program-eligibility requirements the Department has

proposed, or authorized the Department to augment the statutorily prescribed requirements. Rather, Congress adopted specific parameters relating to student debt levels that differ from those proposed by the Department.  For example, as noted above, Congress has established calibrated provisions that render an institution ineligible for certain program funds under Title IV if its students exceed specified CDRs relating to repayment of their federal student loans.  *See, e.g.*, 20 U.S.C. §§ 1085(a)(2), 1087bb(e)(3)(A).  And Congress dictated the particular criteria for the Department to use in calculating CDRs for these programs.  *See id.* §§ 1085(*l*), 1087bb(g)(2). Indeed, Congress recently adjusted these criteria in the HEOA, but Congress again remained silent about the Department's long-standing approach to the HEA's gainful employment language.  In so doing, Congress concluded that the CDR had "served as a relatively reliable indicator of the quality of programs and resulting success of the students in the job market." H.R. Rep. No. 110-500, at 261 (2007).

92.     The "repayment rates" set forth in the final regulations differ fundamentally from the "default rates" adopted by Congress in a number of crucial respects.  For example, the CDR represents Congress's determination that the relevant test for student debt concerns is the rate at which borrowers *default* on their student loans.  *See* 20 U.S.C. §§ 1085(*l*)-(m), 1087bb(g)(2).  By contrast, the Department's repayment rates disregard that default rate.  *See* 34 C.F.R. § 668.7(b)(2), (3).  Additionally, in establishing the CDR framework, Congress *excluded* students who are in deferment or forbearance status from the test, counting only students who are in actual default.  *See* 20 U.S.C. §§ 1085(*l*)-(m), 1087bb(g)(2).  Because deferment and forbearance are potentially available if a student is unemployed, suffering economic hardship, or earning a sufficiently low income, CDRs are insulated to a degree from economic forces—like the recent recession—that are unrelated to program quality, yet that nevertheless make it harder

on average for graduates to pay back their loans.  In contrast, the Gainful Employment tests undermine congressionally authorized debt relief measures such as deferment, forbearance, and income-based or income-contingent repayment plans, because they could—if exercised as intended by Congress—perversely harm the ability of schools to meet the Department's arbitrary standards.  Had Congress intended to punish schools whose students take advantage of these available options, it could have easily done so.  Indeed, income-based repayment plans are an innovation that Congress created in 2007 without any mention of how their use by students would affect program eligibility.

93.     Further, the Gainful Employment regulations run afoul of both 20 U.S.C. § 1232a and the 90/10 rule.  As the Department recognized in its proposal, lowering tuition costs is one of the primary tools at programs' disposal to attempt to comply with the Department's debt tests.  Yet 20 U.S.C. § 1232a forbids the Department from interfering with school administration, and the House Committee that oversees the Department has recognized that the Department "does not currently have the authority to dictate tuition and fee rates for institutions of higher education." H.R. Rep. No. 109-231, at 159 (2005).  Even if the Department had such regulatory authority, it is indisputable that one consequence of lowering program costs is to enable students to pay a greater percentage of their tuition with Title IV funds, which could cause institutions to run afoul of the 90/10 rule.  Indeed, the Gainful Employment regulations force many schools into a "catch 22" situation:  either lower their tuition, thereby courting sanctions under the 90/10 rule, or maintain existing tuition levels, thereby putting their Title IV eligibility at risk under the Gainful Employment regulations.  That is both contrary to the structure of the HEA and arbitrary and capricious.

94.     In any event, Congress recently confirmed in the HEOA that it meant no change to the long-standing "gainful employment" requirement. In the HEOA, Congress modified the definition of "proprietary institution of higher education" to exclude certain programs leading to a baccalaureate degree from the "gainful employment" provision but did not otherwise alter the underlying statutory requirement. *See* Pub. L. No. 110-315, § 102(d)(1), 122 Stat. at 3085-86.

## 2.     The Gainful Employment Regulations Violate The APA.

95.     The Gainful Employment regulations are also arbitrary and capricious in violation of the APA for several reasons. Most generally, the Department failed to engage in reasoned decision-making, consider important aspects of the problem it believed it faced, or provide an adequate explanation for its decision.

96.     The phrase "prepare students for gainful employment" does not permit the Department to establish a regime that affirmatively punishes schools for admitting students of low to moderate means who must borrow to finance their education instead of admitting students who can self-finance a large portion of their program's costs. But by focusing on student debt, that is exactly the arbitrary and capricious regime the Department has adopted.

97.     When it proposed its initial repayment rate, rather than select rates based on data or economic theory, the Department selected rates to reach pre-determined outcomes regarding the number of programs that would be affected. Indeed, a former senior White House educational policy official has admitted that the repayment rates in the proposed regulations were set simply by determining what "the market c[ould] bear," as measured by where "these students [would] then go if the[y] no longer c[ould] attend these particular institutions"—that is to say, the Department's choice of repayment rates was not driven by an analysis that focused on the regulatory concerns at issue; rather, bureaucrats at the Department exceeded the scope of their authority and launched a regulatory regime to put private sector schools at risk of going out of

business. *See* Morgan Stanley's Call on Regulatory and Legislative Issues in the For-Profit Education Sector, at 2-3 (Aug. 12, 2010), http://www.intered.com/storage/deptofed/ MorganStanley_RegLeg.PDF.

98.     In the final regulations, the Department devotes page after page to a purported quantitative analysis that, in the end, relies upon the same flawed, circular reasoning: setting the formula at a level to "identif[y] approximately the lowest-performing quarter of programs." But those programs are only the "lowest-performing" based on the arbitrary formula selected by the Department. 76 Fed. Reg. at 34,397. The Department offers no rational reason either for its chosen test—repayment rates—or for its declaration that programs that fail to achieve a 35 percent repayment rate—as opposed to any other repayment rate—are subject to being classified as not preparing students for gainful employment.

99.     The repayment test also arbitrarily fails to count students as being in "repayment" even though they have been excused from making payments or (in some cases) are making the payments they owe. As noted above, students who take advantage of congressionally authorized deferment or forbearance are counted against schools in the repayment rates; and only a limited number of students in income-based repayment and income-contingent repayment plans can be considered in "repayment." This has the effect of, among other things, holding schools responsible for the choices made by students to avail themselves of temporary debt relief programs created by Congress—which is particularly illogical during economic downturns like the current recession that are entirely out of schools' control.

100.     The regulations also arbitrarily consider repayment rates of students who attended but did not graduate from a school. There is no conceivable justification for declaring that a school failed to prepare a student for gainful employment when the school did not have the

opportunity to deliver its full curriculum to that student. Indeed, it may not even be possible for students to pursue careers in some fields—for example, medicine or accounting—unless they have an additional, advanced degree that entitles them to sit for required examinations.

101.    The final debt-to-earnings and debt-to-discretionary income tests are also arbitrary and capricious.

102.    The Department's decisions to use these metrics to assess students' preparation for gainful employment and to select out of thin air 12 percent and 30 percent thresholds to assess programs' performance on those metrics are arbitrary and capricious. In addition, there is no reasoned explanation for the regulations' exclusive focus on earnings and income accrued during a limited period occurring shortly after graduation. In the Regulatory Impact Analysis accompanying the final Gainful Employment regulations, the Department acknowledges that it used a "net present value" methodology, which compares discounted streams of future costs and benefits of a proposal, to assess the budgetary impacts of the regulations, 76 Fed. Reg. at 34,495; there is no adequate justification for declining to use that same methodology to assess whether a college degree is ultimately a worthwhile investment.

103.    The Department's use of a 10-year loan repayment period to calculate average annual debt payments for students formerly enrolled in certificate and associate's degree programs is also arbitrary and capricious because many students pay their loans over significantly longer periods of time. Furthermore, as with the repayment-rate test, the debt-to-earnings tests hold schools responsible for employment outcomes driven by economic downturns.

104.    Numerous other flaws underlie the Gainful Employment regulations, further highlighting their arbitrary and capricious nature.

105.    Strikingly, both of the gainful employment tests have the effect of penalizing schools for students' decisions to take on debt the Department now views as excessive and students' career and life choices, all of which are out of schools' control.  In fact, as noted above, schools are required to inform students of the maximum amount of federal debt they can incur, while they are simultaneously forbidden from restricting student borrowing to the amount needed to cover tuition and fees and punished in the calculation of CDRs for paying any portion of their students' loans on their behalf.

106.    Indeed, nowhere has the Department explained how student debt—particularly as measured by its two new tests—relates to whether students are prepared for gainful employment. In fact, the Department has not even put forth an analysis purporting to explain how students with unaffordable debt accrued that debt, although several reasons are possible, including overborrowing, excessive living expenses, and repeatedly "restarting" educational pursuits. Further, the Department has not examined why students fail to repay their student loans, when again, several explanations are available, including too much consumer or housing debt, life emergencies, or simply other priorities.

107.    Moreover, the Gainful Employment regulations rest on data and analyses that are flawed in several respects and that significantly understate the impact of the regulations.  For example, to assess debt and income levels in the proposed regulations, the Department relied on data from Missouri.  But as commenters explained—and the Department utterly ignored—that data was not representative and resulted in inaccurate estimates of the regulatory impact.  *See Comment of ITT Educational Services, Inc.*, Docket ED-2010-OPE-0012, at 59-60 (Sept. 9, 2010).  Notwithstanding this fatal flaw, the Department has refused to obtain more reliable data and still bases the final regulations on the Missouri data. *See* 76 Fed. Reg. at 34,474 (Appendix

A, Tbl. 9-A: Impact of the Regulations on Programs (listing Missouri Department of Higher Education among data sources)).

108.   In addition, the Department failed to consider several important and illogical consequences that directly result from the regulatory approach adopted in the final regulations. Most glaringly, the economic background of students receiving loans generally correlates with repayment rates, but the tests adopted in the final rule do not account for this fact.  Thus, the regulations essentially punish private sector schools, which traditionally serve a disproportionate number of low-income and other non-traditional students, and would force schools to limit the enrollment of these students—potentially leaving this underserved group without the ability to obtain higher education.  Moreover, the regulations encourage programs to counsel students to pay off education debt before other debt or to enter certain occupations, which may be contrary to students' interests.  Indeed, the regulations penalize schools when their students choose low-paying public interest careers—for example, nursing graduates who choose to work in community clinics instead of in private practice.  The regulations further punish institutions for enrolling their own programs' graduates in their more advanced programs, as well as for enrolling transfer students.  They also improperly single out private sector schools to address an issue (student indebtedness) that is common to many non-profit institutions as well.

109.   The Gainful Employment regulations are also arbitrary and capricious because they subject private sector schools to sanctions without providing them with a meaningful, *pre*-sanction opportunity to conform their conduct to the applicable standards.  For example, the Department's computation of the debt-to-earnings ratio turns on "the most currently available mean and median annual earnings of the students who completed the program during the [third and fourth fiscal year preceding the most recently completed fiscal year]."  34 C.F.R.

§ 668.7(c)(3). Schools, however, do not have access to *any* data source that would provide the earnings of the relevant group of students. Similarly, schools' primary source of student loan data—the National Student Loan Data System administered by the Department—does not provide schools with an adequate and effective opportunity to determine whether a borrower has made a payment in the relevant period to reduce the outstanding principal balance of his or her Title IV loans. Due to these informational gaps, schools cannot take effective action to improve their performance before they are subject to sanctions.

110.    Similarly, the regulations arbitrarily impose new consequences based on actions that are fully completed before the regulations' effective date. Although Congress has previously recognized that significant changes to Title IV eligibility should be implemented only prospectively, *see, e.g.*, Pub. L. No. 110-315, § 436(e)(2)(B), 122 Stat. at 3257 (HEOA changes to CDR regime), the final regulations will render programs ineligible based on *past years'* data— information that turns directly on schools' *past* decisions, made under the *prior* regulatory regime, regarding curricula and tuition prices. The Department has itself acknowledged the "retroactive implementation" of the regulations, 76 Fed. Reg. at 34,423, noting in particular that "the first final repayment rates [for most programs] will be calculated for FY 2012 and will examine borrowers who first entered repayment in FY 2008 and FY 2009 and who have been in repayment for three to four years." *Id.* at 34,412. The same is true with respect to the debt-to-earnings ratios that will be computed in FY 2012. These calculations include graduates who are not currently enrolled in the programs for which they incurred student loan debt; the opportunity for programs to "*prepare* [them] for gainful employment in . . . recognized occupation[s]." 20 U.S.C. § 1002(b)(1)(A)(i) (emphasis added), as that phrase has now been defined by the Department, has passed.

111.    The final regulations should also be set aside because, with respect to several crucial provisions, the Department violated the APA's notice-and-comment requirement.  5 U.S.C. § 553.

112.    Under the APA, a final rule must be a "logical outgrowth" of the proposed rule. Nothing in the NPRM, however, suggested that the Department might consider rolling out a new category of "failing" programs subject to increasingly ominous and severe sanctions.  Nor did the NPRM suggest that certain programs would be banned from participating in Title IV funding for significant periods of time, as would occur under the three-year ban set forth in the final regulations.  Interested parties could not have anticipated that these new concepts would be introduced in the final regulations, and thus they were not on notice that they should have filed comments on these subjects during the notice-and-comment period.

113.    The Department also improperly seeks to rely on 20 U.S.C. § 3474 and § 1221e-3 as authority for its regulations.  *See* 76 Fed. Reg. at 34,392.  These two statutory provisions do not authorize the Department's sweeping rulemaking, and even if they did, the provisions were not cited in the NPRM and interested parties did not have an opportunity to comment on the Department's purported source of authority as required by the APA.  *See* 5 U.S.C. § 553(b)(2).

### 3.    The Gainful Employment Regulations Violate The Constitution.

114.    The Gainful Employment regulations deprive APSCU's members of a meaningful opportunity to contest adverse determinations by the Department in violation of the procedural guarantees of the Due Process Clause of the Fifth Amendment to the Constitution of the United States.  To calculate the debt-to-earnings ratios the Department will use to determine programs' continued Title IV eligibility, the Department intends to use income data from the SSA.  Because of privacy constraints, the regulations provide that "[a]n institution may not challenge the accuracy of the mean or median annual earnings the Secretary obtained from SSA to calculate

the draft debt-to-earnings ratios for the program." 34 C.F.R. § 668.7(e)(1)(iv). Even with substantial effort and the best of intentions, mistakes will be made in computing and reporting the income statistics, especially in light of the complex algorithm set forth in the regulations. But schools will not be able to challenge the Department's computations.

115.   Notably, the Department recently admitted that it published miscalculated CDRs, which are substantially easier to calculate than the debt-to-earnings tests set forth in the Gainful Employment regulations. Thus, it is hard to believe that similar errors will be avoided in the future.

116.   The Gainful Employment regulations also violate the Due Process Clause because, as discussed above, they subject private sector schools to sanctions based on events that are fully completed before the regulations are effective and deny schools a meaningful opportunity to conform their conduct.

117.   The sanctions the Department intends to impose on programs that fail to satisfy the gainful employment tests, *see* 34 C.F.R. § 668.7(j), also violate the First Amendment. If the Department notifies an institution that one of its programs is deemed "failing," the institution is compelled against its will to make several communications to the program's current and prospective students. For example, the regulations force schools to point students toward educational opportunities offered by their competitors, toward resources provided by the government at www.collegenavigator.gov, *id.* § 668.7(j)(2)(C), and to confess by way of a "clear and conspicuous statement" that "a student who enrolls or continues in the program *should expect* to have difficulty repaying his or her student loans," *id.* § 668.7(j)(2)(D) (emphasis added). These warnings thus require institutions to carry the Department's *non-factual* views—*i.e.*, that www.collegenavigator.gov is a viable tool to assess educational programs, that

competitor programs might in fact provide a comparable or preferable option for the student,

and, most alarmingly, that every student "*should expect*" to have difficulty repaying his or her

loans. *Id.* (emphasis added). Accordingly, these warnings fall outside the narrow scope of

factual and uncontroversial information that the government may constitutionally require market

participants to disclose consistent with the First Amendment. At the very least, it is arbitrary to

compel schools to make these disclosures, especially considering that the regulations empower

the Department to publicize information related to schools' debt measures. 34 C.F.R.

§ 668.7(g)(6)(ii).

**B.     The Program Approval Regulations.**

118.     The Program Approval regulations are improper in numerous respects. Most

importantly, they are beyond the Department's authority because they are designed to facilitate

implementation of the Gainful Employment regulations, which are themselves unauthorized.

119.     The Program Approval regulations also exceed the Department's authority on

their own. By authorizing the Department to review "the need," 34 C.F.R. § 600.20(d)(2)(i), for

graduates of a particular program in a particular region, the regulations place the Department in

the role of serving as a central economic planner for the nation—a result that Congress did not

intend.

120.     The Program Approval regulations also improperly invite the Department to

review and exercise control over an institution's curriculum decisions in violation of 20 U.S.C.

§ 1232a, which flatly prohibits interference of this kind by the federal government.

121.     Further, the regulations are arbitrary and capricious. The Department has

estimated that the Program Approval regulations would have a net budgetary effect of $0.0

million. 75 Fed. Reg. at 66,673. If the regulations are not going to reduce the cost of Title IV to

the taxpayers arising out of defaulted loans by preventing institutions from offering new

programs that, in the Department's judgment, are unlikely to lead to gainful employment, then the Department's regulations lack any rational justification.

122.    The regulations also do not provide schools with sufficient notice of whether they will be required to obtain program approval.  Under the regulations, regardless of when a school notifies the Department of its intent to establish a new program, the Department has until 30 days before the new program starts to decide whether it will require the program to seek approval.  By that time, schools will have invested significant resources in locating and renting available space, hiring faculty, and enrolling students.  It is arbitrary and capricious for the Department to give itself the authority to place a long-planned program—and its students—in limbo merely 30 days before the program is set to begin.

123.    Finally, the final regulations impermissibly depart from the Program Approval regulations proposed by the Department, thus depriving interested parties of an opportunity to comment on the final Program Approval regulations.  Among other things, the final regulations (i) eliminate, without explanation, the exceptions in 34 C.F.R. § 600.10(c), which permitted schools to establish new programs that either "[l]ead[] to an associate, baccalaureate, professional, or graduate degree" or "[p]repare[] students for gainful employment in the same or related recognized occupation as an educational program that has previously been designated as an eligible program at that institution by the Secretary" without additional approval; (ii) give the Secretary excessive discretion to require approval of new programs on a case-by-case basis; (iii) impose new standards for deciding whether to accept a new program; and (iv) as explained above, enable the Department to prevent a new program from operating on merely 30 days of notice.  These are all novel provisions that were not included in the Department's original

proposal.  Accordingly, the final Program Approval regulations are not a logical outgrowth of the Department's original proposal.

C.      **The Reporting And Disclosure Regulations.**

124.    The Reporting and Disclosure regulations are improper in a number of respects. They are beyond the Department's authority because they are designed to facilitate implementation of the Gainful Employment regulations, which are themselves unauthorized. Apart from invoking the gainful employment requirement of the HEA, *see* 75 Fed. Reg. at 66,949, the Department has provided no basis for its authority to compel reporting and disclosure of *private* borrowing and other information called for by the final regulations.

125.    Further, the regulations violate 20 U.S.C. § 1015c(a), which prohibits "the development, implementation, or maintenance of a Federal database of personally identifiable information on individuals receiving assistance under this chapter."  The collection and maintenance of "[i]nformation needed to identify [a] student" and information regarding the amounts "[a] student received from private education loans and the amount from institutional financial plans," 34 C.F.R. § 668.6(a)(1)(i)(A), (C)(2), falls within section 1015c(a)'s prohibition.

126.    The Reporting and Disclosure regulations are also arbitrary and capricious for numerous reasons including the fact that the Department has failed to provide a reasoned basis for their promulgation.  For example, the Department has not provided a satisfactory justification for requiring schools to report student-by-student loan information or for requiring schools to report information regarding *private*, non-Title IV loans.

127.    In addition, the regulations compel schools to disclose information to students that is likely to be confusing.  For example, under so-called "Student Right to Know" rules, schools must already disclose *institutional* placement rates to students.  34 C.F.R. § 668.41(d)(5).  Under

the Reporting and Disclosure regulations, institutions must also disclose both the program-placement rates used by their accreditors and their State regulators. *See* Dep't of Educ., *Gainful Employment—FAQ*, *available at* http://www.ifap.ed.gov/GainfulEmploymentInfo/2011GEFAQ.html.  These rates, however, very likely differ across the various accrediting and State agencies that regulate schools.  In short, the poorly designed Reporting and Disclosure regulations arbitrarily compel schools to provide students with an array of bewildering statistics that have little, if any, informational content.

## VI.   IRREPARABLE HARM.

128.   All of the final regulations challenged in this lawsuit, if not set aside before July 1, 2012, will significantly and irreparably harm APSCU's members.  Students who otherwise would have enrolled at an institution will be pressured to attend a different school or to abandon their educational pursuits entirely, causing irreparable changes to the make-up of student bodies at schools and a decrease in the enrollment of underserved groups.  Certain current students will be pressured to transfer to different schools or to end their studies.  Schools will have to terminate employees and courses of study.  Schools' right to shape the content of their curricula and promotional materials will be impaired and their reputations will be severely damaged.  Schools will be deprived of revenues that they will never be able to recover.  Some schools may be forced to go out of business entirely.

### COUNT I
### (Gainful Employment Regulations:  Violation Of The First Amendment)

129.   Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

130.   The Gainful Employment regulations violate APSCU's members' right to free speech by compelling them to utter non-factual and highly controversial statements.

131.    Accordingly, the Gainful Employment regulations are contrary to constitutional right, power, privilege, or immunity, in violation of 5 U.S.C. § 706(2)(B).

## COUNT II
## (Gainful Employment Regulations:  Violations Of Due Process)

132.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

133.    The Gainful Employment regulations violate Due Process by subjecting schools to sanctions based on actions that were fully completed before the effective date of the regulations.

134.    Moreover, the regulations unconstitutionally deny APSCU's members a meaningful opportunity to challenge the validity of the Department's application of the debt-to-earnings and repayment-rate tests.

135.    Accordingly, the Gainful Employment regulations are contrary to constitutional right, power, privilege, or immunity, in violation of 5 U.S.C. § 706(2)(B).

## COUNT III
## (Gainful Employment Regulations:  No Statutory Authority)

136.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

137.    The Gainful Employment regulations constitute final agency action.

138.    APSCU's members are adversely affected and aggrieved by the Gainful Employment regulations.

139.    The Gainful Employment regulations are not authorized under Title IV of the HEA, 20 U.S.C. § 1070 *et seq.*

140.    The Gainful Employment regulations exceed the Department's statutory jurisdiction and authority.

141.    Accordingly, the Gainful Employment regulations are in excess of statutory authority, jurisdiction, and limitations, in violation of 5 U.S.C. § 706(2)(C), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT IV
### (Gainful Employment Regulations:  Arbitrary And Capricious)

142.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

143.    The Gainful Employment regulations are arbitrary and capricious.  Among other things, the Department failed to engage in reasoned decision-making; to consider important aspects of the problem it believed it faced; to provide an adequate explanation for its decision; to offer a reasoned basis for its departure from its long-standing interpretation of the statutory phrase "gainful employment"; and to respond adequately to significant arguments raised in comments.  The Gainful Employment regulations are also premised upon flawed and incomplete data; they lack any basis in economic theory or sound evidence; they arbitrarily select quantitative metrics without any foundation in the record; they fail to allow schools to alter their policies in an attempt to remain in compliance before imposing sanctions; they unfairly impose retroactive consequences for past decisions by APSCU's members; they compel schools to make non-factual and controversial statements; and they are not properly designed to remedy the problems the Department purports to address.

144.    Accordingly, the Gainful Employment regulations are arbitrary, capricious, an abuse of discretion, or otherwise are not in accordance with the law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT V
### (Gainful Employment Regulations:  Denial Of Notice And Comment Rights)

145.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

146.     The Gainful Employment regulations depart substantially from the proposed regulations noticed by the Department in its July 26, 2010 NPRM.

147.     Interested parties could not reasonably have anticipated that the Department would adopt certain aspects of the Gainful Employment regulations—including the "debt warnings" and the "wait out" periods—as final rules.  Accordingly, APSCU and its members lacked sufficient notice of and were therefore unable to comment upon certain aspects of the Gainful Employment regulations before they became final.

148.     Therefore, the Gainful Employment regulations were promulgated "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

149.     APSCU's members are prejudiced by the Department's failure to provide sufficient notice and an adequate opportunity to comment before those regulations became final.

## COUNT VI
### (Program Approval Regulations:  No Statutory Authority)

150.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

151.     The Program Approval regulations constitute final agency action, and APSCU's members are adversely affected and aggrieved by the Program Approval regulations.

152.     The Program Approval regulations conflict with provisions of the HEA and the GEPA, including 20 U.S.C. § 1232a.

153.     The Program Approval regulations exceed the Department's statutory jurisdiction and authority.

154.     Moreover, the Program Approval regulations are inextricably related and necessarily ancillary to, and dependent upon, the unlawful Gainful Employment regulations because they function only as adjuncts to the Gainful Employment regulations.

155.    Accordingly, the Program Approval regulations are in excess of statutory authority, jurisdiction, and limitations, in violation of 5 U.S.C. § 706(2)(C), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT VII
### (Program Approval Regulations:  Arbitrary And Capricious)

156.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

157.    The Program Approval regulations are arbitrary and capricious.  For example, the Department failed to engage in reasoned decision-making; to consider important aspects of the problem it believed it faced; to provide an adequate explanation for its decision; to offer a reasoned basis for its departure from the prior program approval rules; to respond to significant arguments raised in comments; and to provide any reasoned basis for rushing to proceed with the Program Approval regulations and to defer action upon the inextricably related Gainful Employment regulations until months later.

158.    Additionally, notwithstanding that the Program Approval regulations are inextricably related and necessarily ancillary to, and dependent upon, the Gainful Employment regulations, the Department promulgated the Program Approval regulations in final form on October 29, 2010, more than seven months before the Department promulgated the final Gainful Employment regulations.  Because the legal and factual issues the Program Approval regulations and the Gainful Employment regulations raise are inextricably related and inseparable, it was arbitrary and capricious for the Department to promulgate the Program Approval regulations on October 29, 2010, and to defer consideration of the Gainful Employment regulations.

159.    Accordingly, the Program Approval regulations are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT VIII
**(Program Approval Regulations:  Denial Of Notice And Comment Rights)**

160.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

161.    The final Program Approval regulations depart substantially from the proposed regulations noticed by the Department in its July 26, 2010 NPRM.

162.    APSCU and its members were not afforded an adequate opportunity to comment on critical features of the Program Approval regulations—particularly the elimination of the exceptions in 34 C.F.R. § 600.10(c)(2), the imposition of new criteria for reviewing new program applications, and the unbounded discretionary authority to halt a new program with no more than 30 days' notice—before those rules became final.

163.    Interested parties could not reasonably have anticipated that the Department would adopt the Program Approval regulations as final regulations.  Accordingly, APSCU and its members lacked sufficient notice of the final Program Approval regulations.

164.    Therefore, the Program Approval regulations were promulgated "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

165.    APSCU's members are prejudiced by the Department's failure to provide sufficient notice and an adequate opportunity to comment before those regulations became final.

## COUNT IX
**(Reporting And Disclosure Regulations:  No Statutory Authority)**

166.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

167.    The Reporting and Disclosure regulations constitute final agency action, and APSCU's members are adversely affected and aggrieved by the Reporting and Disclosure regulations.

168.    The Reporting and Disclosure regulations conflict with provisions of the HEA, including 20 U.S.C. § 1015c.

169.    The Reporting and Disclosure regulations exceed the Department's statutory jurisdiction and authority.

170.    Moreover, the Reporting and Disclosure regulations are inextricably related and necessarily ancillary to, and dependent upon, the unlawful Gainful Employment regulations because they function only as adjuncts to the Gainful Employment regulations.

171.    Accordingly, the Reporting and Disclosure regulations are in excess of statutory authority, jurisdiction, and limitations, in violation of 5 U.S.C. § 706(2)(C), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

### COUNT X
### (Reporting And Disclosure Regulations:  Arbitrary And Capricious)

172.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

173.    The Reporting and Disclosure regulations are arbitrary and capricious.  For example, the Department failed to engage in reasoned decision-making; to consider important aspects of the problem it believed it faced; to provide an adequate explanation for its decision; and to respond adequately to significant arguments raised in comments.

174.    Additionally, notwithstanding that the Reporting and Disclosure regulations are inextricably related and necessarily ancillary to, and dependent upon, the Gainful Employment regulations, the Department promulgated the Reporting and Disclosure regulations in final form on October 29, 2010, more than seven months before the Department promulgated the final Gainful Employment regulations.  Because the legal and factual issues raised by the Reporting and Disclosure regulations and the Gainful Employment regulations are inextricably related and inseparable, it was arbitrary and capricious for the Department to promulgate the Reporting and Disclosure regulations on October 29, 2010, and to defer consideration of the Gainful Employment regulations.

175.    Accordingly, the Reporting and Disclosure regulations are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

1.    Declare the Gainful Employment regulations, the Program Approval regulations, and the Reporting and Disclosure regulations unlawful.

2.    Vacate and set aside the Gainful Employment regulations, the Program Approval regulations, and the Reporting and Disclosure regulations.

3.    Declare that any action taken by Defendants pursuant to the Gainful Employment regulations, the Program Approval regulations, and the Reporting and Disclosure regulations is null and void.

4.    Enjoin Defendants and their officers, employees, and agents from implementing, applying, or taking any action whatsoever pursuant to the Gainful Employment regulations, the Program Approval regulations, and the Reporting and Disclosure regulations.

5.    Issue all process necessary and appropriate to postpone the effective date of the Gainful Employment regulations, the Program Approval regulations, and the Reporting and Disclosure regulations and to maintain the status quo pending the conclusion of this case.

6.    Award Plaintiff its costs and reasonable attorneys' fees as appropriate.

7.    Grant such further and other relief as this Court deems just and proper.

Respectfully submitted,

Dated:  July 20, 2011

_____

DOUGLAS R. COX, DC Bar No. 459668
DCox@gibsondunn.com
NIKESH JINDAL, DC Bar No. 492008
NJindal@gibsondunn.com
DEREK S. LYONS, DC Bar No. 995720
DLyons@gibsondunn.com
VERONICA S. ROOT, DC Bar No. 992717
VRoot@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

TIMOTHY J. HATCH, DC Bar No. 374694
THatch@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7500
Facsimile: (213) 229-7520

*Attorneys for Plaintiff Career College Association
d/b/a Association of Private Sector Colleges and
Universities*