## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ASSOCIATION OF PRIVATE COLLEGES AND UNIVERSITIES,**<br><br>        **Plaintiff,**<br><br>**v.**<br><br>**ARNE DUNCAN, in his official capacity as Secretary of the Department of Education,**<br><br>**and**<br><br>**UNITED STATES DEPARTMENT OF EDUCATION,**<br><br>        **Defendants.** | **Civil Action 11-1314 (RC)** |

## MEMORANDUM OPINION

To be eligible to accept federal funds under Title IV of the Higher Education Act, some institutions of higher education must "prepare students for gainful employment in a recognized occupation."  20 U.S.C. §§ 1001(b)(1), 1002(b)(1)(A)(i), (c)(1)(A).  Last year, the Department of Education (the "Department") published a rule that tests compliance with the gainful employment requirement by examining the debt, earnings, and debt repayment of a program's former students.  The Association of Private Colleges and Universities (the "Association") has brought suit against the Department and its Secretary to challenge those debt measures and two other related rules.  Because one of the debt measures lacks a reasoned basis, that regulation will be vacated as arbitrary and capricious.  Because the majority of the related rules cannot stand without the debt measures, they will be vacated as well.

# I. BACKGROUND

## A. Title IV of the Higher Education Act

Every year, Congress provides billions of dollars through loan and grant programs to help students pay tuition for their postsecondary education. The Department of Education . . . administers these programs, which were established under Title IV of the Higher Education Act of 1965 . . . . Students must repay their federal loans; the costs of unpaid loans are borne by taxpayers.

To participate in Title IV programs – *i.e.*, to be able to accept federal funds – a postsecondary institution . . . must satisfy several statutory requirements. These requirements are intended to ensure that participating schools actually prepare their students for employment, such that those students can repay their loans.

*Ass'n of Private Sector Colls. & Univs. v. Duncan*, 2012 WL 1992003, at *1 (D.C. Cir. June 5, 2012); *see also id.* at *2 ("[S]chools receive the benefit of accepting tuition payments from students receiving federal financial aid, regardless of whether those students are ultimately able to repay their loans. Therefore, Congress codified statutory requirements in the HEA to ensure against abuse by schools."). The statutory requirement at issue in this case makes that intent explicit, requiring that certain institutions "prepare students for gainful employment in a recognized occupation." 20 U.S.C. §§ 1001(b)(1), 1002(b)(1)(A)(i), (c)(1)(A). For some institutions, that preparation must take the form of an "eligible program of training," *id.*, §§ 1002(b)(1)(A)(i), (c)(1)(A); an "eligible program," in turn, is one which "provides a program of training to prepare students for gainful employment in a recognized profession," *id.* § 1088(b)(1)(A)(i). These requirements have a long history in the statute, which bears some review.

## B. Statutory History

Over three weeks in 1965, Congress enacted the National Vocational Student Loan Insurance Act, Pub. L. No. 89-287, 79 Stat. 1037 (codified at 20 U.S.C. §§ 961–96 (Supp. I 1965)) ("NVSLIA"), and the Higher Education Act, Pub. L. No. 89-329, 79 Stat. 1219 (codified

at 20 U.S.C. §§ 1001–107 (Supp. I 1965)) ("HEA").  Both were intended "to encourage States and nonprofit private institutions and organizations to establish adequate loan insurance programs for students in eligible institutions."  NVSLIA § 2(a)(1); HEA § 421(a)(1).  Because many states did not yet have such programs, each Act also established "a Federal program of student loan insurance for students who do not have reasonable access to a State or private nonprofit program."  NVSLIA § 2(a)(2); HEA § 421(a)(2).  Under each program, the federal government itself would ensure loans "made to a student who . . . has been accepted for enrollment at an eligible institution."  NVSLIA § 8(a)(1); HEA § 427(a)(1).  The structures of those programs were quite similar,[1] but their definition of "eligible institution" differed.  Only "a public or other nonprofit institution" could be eligible under the Higher Education Act.  HEA § 435(a)(4).  Although that Act was primarily targeted towards institutions awarding bachelor's degrees or granting credit that could be used towards such a degree, *see id.* § 435(a)(3), nursing schools were also eligible for its loan insurance program, as was "any school which provide[d] not less than a one-year program of training to prepare students for gainful employment in a

---

[1] The Senate subcommittee considering the National Vocational Student Loan Insurance Act noted that "[t]he proposed legislation for vocationally oriented students parallels the provisions of title IV–B of H.R. 9567 . . . which provided insured reduced-interest-rate loans for college and university students."  S. Rep. No. 89-758, at 1 (1965).  H.R. 9567 became the Higher Education Act of 1965.  When the Senate's companion measure was first introduced, "[t]he vocational insured loan program was incorporated in . . . the Higher Education Act of 1965 . . . ."  S. Rep. No. 89-758, at 1 (1965).  The House subcommittee then decided "to separate from the higher education bill the financial aid provisions designed to assist those attending postsecondary vocational schools."  *Id.*  The Senate followed suit but "adopted as a policy, that the terms and conditions of the proposed insured and reduced interest loan benefits to the vocationally oriented student should be placed, to the maximum extent feasible, on the same basis as equivalent financial assistance afforded the college and university student under H.R. 9567," *id.* at 2.  The Senate therefore rewrote the House version of the National Vocational Student Loan Insurance Act to conform it to Title IV of the Higher Education Act.  *Id.*

recognized occupation," *id.* § 435(a).  The National Vocational Student Loan Insurance Act, by

contrast, extended eligibility to for-profit schools but limited it to institutions providing "a

program of postsecondary vocational or technical education designed to fit individuals for useful

employment in recognized occupations."  NVSLIA § 17(a).

The House subcommittee considering the National Vocational Student Loan Insurance

Act "devoted the majority of its attention to the 'eligible institution' definition . . . ."  H.R. Rep.

No. 89-308, at 9 (1965).  "It was the determined intent [of both the House and Senate

subcommittees] that the 'fly-by-night' institutions of the post-World War II era be explicitly

eliminated from eligibility."  *Id.*; S. Rep. No. 89-758, at 12 (1965).  Both subcommittees heard

testimony from Dr. Kenneth B. Hoyt, a professor of education at the University of Iowa who ran

"a national research program aimed at studying students who attend a trade, technical, or

business school at the post-high-school level."  H.R. Rep. No. 89-308, at 3 (1965).  They placed

considerable weight on Dr. Hoyt's testimony, reprinting his comments at length in otherwise

brief reports and emphasizing their influence.  *Id.* ("Dr. Hoyt soon dispelled any doubts the

subcommittee may have had about the need for such legislation and about the caliber of student

attending a vocational institution."); S. Rep. No. 89-758, at 3 (1965) ("Dr. Hoyt's statement

confirmed the committee's estimate of the need for such legislation and of the high caliber of

students attending vocational institutions.").

Dr. Hoyt began his discussion of the experiences of students after completing their

vocational training by posing two questions:  "If loans were made to these kinds of students, is it

likely they could repay them following training?  Would loan funds pay dividends in terms of

benefits accruing from the training students received?"  H.R. Rep. No. 89-308, at 4 (1965); S.

Rep. No. 89-758, at 7 (1965).  He noted that "most of these students do complete their training" but nonetheless "included both those who completed and those who failed to complete training" in his "analyses of posttraining vocational experiences."  H.R. Rep. No. 89-308, at 4 (1965); S. Rep. No. 89-758, at 7 (1965).  Those analyses indicated that "over 95 percent of those who sought employment found it," and a substantial majority found employment related to their training.  H.R. Rep. No. 89-308, at 4–5 (1965); S. Rep. No. 89-758, at 7 (1965).  As Dr. Hoyt concluded:

> It seems evident that, in terms of this sample of students, sufficient numbers were working for sufficient wages so as to make the concept of student loan [repayment] to be rapid following graduation a reasonable approach to take. . . . [A]ll data presented here support the reasonableness of making loan funds available to students attending trade, technical, and business schools.  I have found no reason to believe that such funds . . . would represent a poor financial risk.

H.R. Rep. No. 89-308, at 5–6 (1965); S. Rep. No. 89-758, at 8 (1965) (first alteration in House version).  Each subcommittee also emphasized other testimony suggesting that vocational students would be able to repay the loans incurred to gain that training.[2]

---

[2]  H.R. Rep. No. 89-308, at 6 (1965) ("The subcommittee was . . . greatly aided in its efforts by financial data from the New York Higher Education Assistance Corp.," which "operates a guaranteed loan program in New York for students attending postsecondary vocational institutions."  Out of $2 million dollars in guaranteed loans, only $16,320 were in default.  "Needless to say, these default figures are largely unmatched by any other loan program for any category of student."); S. Rep. No. 89-758, at 9 (1965) ("The relatively short enrollment period in most private trade and technical schools coupled with the demonstrated effectiveness of their placement departments assures the lending agency of a better than average credit risk.") (Summary of comments of Mr. J. Warren Davies, president of Lincoln Technical Institute, Newark, N.J.); *id.* at 11 ("[T]he . . . material rewards of continued education are such that the students receiving loans will, in almost every case, be enabled to repay them out of the added income resulting from their better educational status.") (Comments of Mr. Lattie M. Upchurch, Jr., executive vice president of Capitol Radio Engineering Institution, Washington, D.C.).

Congress merged the two student loan insurance programs in 1968, but retained their separate definitions of eligibility.  Higher Education Amendments of 1968, Pub. L. No. 90-575, § 116(a), 82 Stat. 1014.  Any school that had been an "eligible institution" under the Higher Education Act became an "institution of higher education," *id.* § 116(a)(3), while those that had been eligible under the National Vocational Student Loan Insurance Act became "vocational schools," *see id.* § 116(a)(4)(B).  Both institutions of higher education and vocational schools were now eligible to participate in Title IV programs.  *See* 20 U.S.C. § 1085(a) (1970) ("The term 'eligible institution' means (1) an institution of higher education, [and] (2) a vocational school . . . ."); *id.* § 1085(b) (defining "institution of higher education"); *id.* § 1085(c) (defining "vocational school").  As the Higher Education Act evolved over the years, these definitions remained remarkably stable.  *See* 20 U.S.C. § 1085(a)–(c) (Supp. II 1972) (definitions unchanged by Education Amendments of 1972, Pub. L. No. 92-318, 86 Stat. 235); 20 U.S.C. § 1085(a)–(c) (1976) (no relevant amendments made by Education Amendments of 1976, Pub. L. No. 94-482, 90 Stat. 281); 20 U.S.C. § 1085(a)–(c) (Supp. IV 1980) (no relevant amendments made by Education Amendments of 1980, Pub. L. No. 96-374, 94 Stat. 1367); 20 U.S.C. § 1085(a)–(c) (1988) (no relevant amendments made by Higher Education Amendments of 1986, Pub. L. No. 99-498, 100 Stat. 1268).

In 1992, Congress revised and reorganized the definitions, replacing "vocational school" with two new terms—"proprietary institution of higher education" and "postsecondary vocational institution."  Higher Education Amendments of 1992, § 481, Pub. L. No. 102-325, 106 Stat. 448 (codified at 20 U.S.C. §§ 1088(b), (c) (1994)).  Proprietary institutions of higher education were, by definition, for-profit institutions, 20 U.S.C. § 1088(b)(3) (1994), while

postsecondary vocational institutions were public or non-profit, *id.* § 1088(c)(2) (1994).  Both

were now required to provide "an eligible program of training to prepare students for gainful

employment in a recognized occupation," *id.* §§ 1088(b)(1), (c)(1) (1994), rather than "a

program of postsecondary vocational or technical education designed to fit individuals for useful

employment in recognized occupations," 20 U.S.C. § 1085(c)(2) (1988).  An eligible program, in

turn and as relevant here, was "a program of training to prepare students for gainful employment

in a recognized profession."  20 U.S.C. § 1088(e)(1)(A)(i) (1994).  Despite some further

reorganization of the statute, those definitions remain unchanged. *See* 20 U.S.C.

§§ 1002(b)(1)(A)(i), (c)(1)(A), 1088(b)(1)(A)(i) (Supp. IV 2010).

### C. Challenged Regulations

The Secretary enjoys broad authority "to make, promulgate, issue, rescind, and amend

rules and regulations governing the manner of operation of, and governing the applicable

programs administered by, the Department."  20 U.S.C. § 1221e-3; *see also id.* § 3474 ("The

Secretary is authorized to prescribe such rules and regulations as the Secretary determines

necessary or appropriate to administer and manage the functions of the Secretary or the

Department.").  Before proposing regulations to implement Title IV programs, however, the

Secretary must "obtain public involvement in the development" of the regulations, "prepare draft

regulations . . . and . . . submit such regulations to a negotiated rulemaking process."  20 U.S.C.

§ 1098a(a)(1), (b)(1).  In 2009, the Department began this process by announcing its intent "to

develop proposed regulations to maintain or improve program integrity in the Title IV, HEA

programs, relating to topics such as . . . [g]ainful employment in a recognized occupation."

Negotiated Rulemaking Committees, 74 Fed. Reg. 24,728, 24,728 (May 26, 2009).  After three

7

public hearings, the Department established a negotiating committee.  Notice of Negotiated

Rulemaking, 74 Fed. Reg. 46,399, 46,399–400 (Sept. 9, 2009).  When that committee failed to

reach consensus, the Department proposed regulations of its own.  As relevant here, the

Department proposed reporting and disclosure requirements for gainful employment programs,

*see* Program Integrity Issues, 75 Fed. Reg. 34,806, 34,809, 34,873 (June 18, 2010), and also

proposed to "assess whether a program provides training that leads to gainful employment by

applying two tests: One test based upon debt-to-income ratios and the other test based upon

repayment rates."  Program Integrity: Gainful Employment, 75 Fed. Reg. 43,616, 43,618 (July

26, 2010).  The court will refer to these tests as the "debt measures."

      The Department explained that the proposed debt-to-income ratios, which "provide[] a

measure of program completers' ability to repay their loans, . . . were set based upon industry

practices and expert recommendations."  *Id.*  Under the proposed debt-to-income tests,

"programs whose completers typically have annual debt service payments that are 8 percent or

less of average annual earnings or 20 percent or less of discretionary income would continue to

qualify, without restrictions, for title IV, HEA program funds," while "[p]rograms whose

completers typically face annual debt service payments that exceed 12 percent of annual average

earnings and 30 percent of discretionary income may become ineligible."  *Id.*  The discretionary

income portion of the debt-to-income test was "modeled on the Income-Based Repayment (IBR)

plan," which "assumes that borrowers with incomes below 150 percent of the poverty guideline

are unable to make any payment, while those with incomes above that level can devote 15

percent of each added dollar of earnings . . . to loan payments."  *Id.* at 43,620.  That formula, in

turn, was "based on research conducted by economists Sandy Baum and Saul Schwartz, who

recommended 20 percent of discretionary income as the outer boundary of manageable student

loan debt" and was also "recommended by others, including Mark Kantrowitz, publisher of

Finaid.org." *Id.* To rely solely on the discretionary income test portion of the debt-to-income

test, however, would mean that "any program would fail the debt measure if the average earnings

of those completing the program were below 150 percent of the poverty guideline, regardless of

the level of debt incurred." *Id.* "To avoid this consequence," the Department "adopted the

proposal made during negotiated rulemaking that borrowers should not devote more than 8

percent of annual earnings toward repaying their student loans." *Id.* This figure was "a fairly

common credit-underwriting standard," accepted by "[o]ther studies" and within the range of

guidelines established by "some State agencies." *Id.* The Department then "increased the

research-based and industry-used debt-to-income measures by 50 percent (from 20 to 30 percent

of discretionary income, and from 8 to 12 percent of annual earnings) to establish thresholds

above which it becomes unambiguous that a program's debt levels are excessive." *Id.* Programs

that met neither of the more demanding standards could have their Title IV eligibility restricted,

while those that met neither of the more lenient standards could face ineligibility.

The debt repayment test, in turn, would "measure . . . whether program enrollees are

repaying their loans, regardless of whether they completed the program." *Id.* at 43,618. A

gainful employment program would pass the proposed debt repayment test if "students who

attended the program (and are not in a military or in-school deferment status) repay their Federal

loans at an aggregate rate of at least 45 percent. . . . A loan would be counted as being repaid if

the borrower (1) made loan payments during the most recent fiscal year that reduced the

outstanding principal balance, (2) made qualifying payments on the loan under the Public

Service Loan Forgiveness Program, as provided in 34 CFR 685.219(c), or (3) paid the loan in full." *Id.* at 43,619.  Borrowers whose loans were in deferment or forbearance would not be considered to be repaying their loans.  *Id.*  The Department analyzed how many schools in various sectors "would satisfy loan repayment thresholds of 45 and 35 percent," concluding that "[t]he number of institutions with very low loan repayment rates, particularly in the for-profit sector, is alarmingly high."  *Id.*  After its analysis, the Department proposed that programs with a repayment rate of at least forty-five percent would pass the debt repayment test, those with repayment rates lower than forty-five percent but higher than thirty-five percent would face restricted eligibility, and programs with repayment rates below thirty-five percent would face ineligibility.  *Id.* at 43,619–20.  The Department did not explain why it had chosen those thresholds,[3] although it did indicate that, "[a]t the negotiated rulemaking sessions," it had "suggested a loan repayment rate of 75 percent of all borrowers in a program, and later suggested a rate of 90 percent for completers" but "modified its expectations for loan repayment in light of further research and community input."  *Id.* at 43,692.

A gainful employment program that failed to satisfy the proposed debt measures would face several consequences.  If the program's loan repayment rate fell below forty-five percent and it failed to meet the more stringent standard for both debt-to-income measures, it would be

---

[3] The Department did note that "[t]he proposed regulation sets the repayment rate for ineligibility for gainful employment programs at 35 percent, indicating that slightly more than a third of recent former students are able to begin paying down their loan principal with money or through public service.  According to the Department's analysis . . . if this rate were applied to all public and nonprofit institutions fewer than 18 percent of them would fail to meet the measure.  Of for-profit institutions, 48 percent currently fall below the 35 percent mark."  *Id.* at 43,662; *see also id.* at 43,670 (noting that, based on the Department's analysis, "80 percent of the public institutions would meet the 35 precent repayment rate requirement, while only 60 percent of the for-profit institutions would meet that test").

required to warn "prospective and currently enrolled students that they may have difficulty repaying loans obtained for attending that program." *Id.* at 43,639 (proposing 34 C.F.R. § 668.7(d)(1)). Programs could also have their Title IV eligibility restricted or revoked. The former would occur whenever a program either had a repayment rate below forty-five percent or failed to meet the more stringent standard for both debt-to-income measures, but either had a repayment rate above thirty-five percent or met the more lenient standard for at least one debt-to-income measure. Programs whose loan repayment rates fell below thirty-five percent and which also failed to meet the more lenient standard for both debt-to-income measures would be declared ineligible. Finally, schools wishing to offer new gainful employment programs, which of course would have no data with which to calculate the proposed debt measures, would be required to apply to have the new program approved by the Department. *Id.* at 43,624.

After a period of public comment, the Department published three final regulations: the reporting and disclosure rule, Program Integrity Issues, 75 Fed. Reg. 66,832, 66,835–44, 66,948–49 (Oct. 29, 2010) (promulgating 34 C.F.R. § 668.6), the program approval rule, Program Integrity: Gainful Employment—New Programs, 75 Fed. Reg. 66,665 (Oct. 29, 2010) (amending 34 C.F.R. §§ 600.10, 600.20), and the debt measure rule, Program Integrity: Gainful Employment—Debt Measures, 76 Fed. Reg. 34,386 (June 13, 2011) (promulgating 34 C.F.R. § 668.7). The reporting and disclosure rule required gainful employment programs to report the information necessary for the Department to calculate the debt measures, 34 C.F.R. § 668.6(a), and to disclose to prospective students various facts about the program, including the occupation that the program prepares students to enter, the on-time graduation rate for students completing

the program, the tuition and fees charged, and the placement rate and median loan debt for students completing the program, *id.* § 668.6(b).

The program approval rule provided that a school "must notify the Secretary at least 90 days before the first day of class when it intends to add an educational program that prepares students for gainful employment in a recognized occupation." 34 C.F.R. § 600.10(c)(1). After providing such notice, the school could proceed to offer the program "unless the Secretary alerts the institution at least 30 days before the first day of class that the program must be approved for title IV, HEA purposes." *Id.* § 600.20(d)(1)(ii)(B). If the Secretary decided to require program approval—that is, if the Secretary in his discretion decided to take a closer look at the program—he would treat the school's notice as an application for approval and proceed to evaluate four factors: "(*1*) [t]he institution's demonstrated financial responsibility and administrative capability in operating its existing programs"; "(*2*) [w]hether the additional educational program is one of several new programs that will replace similar programs currently provided by the institution, as opposed to supplementing or expanding the current programs provided by the institution"; "(*3*) [w]hether the number of additional educational programs being added is inconsistent with the institution's historic program offerings, growth, and operations"; and "(*4*) [w]hether the process and determination by the institution to offer an additional educational program that leads to gainful employment in a recognized occupation is sufficient." *Id.* § 600.20(d)(1)(ii)(E). Any denial of an application would be based on the second, third, and fourth of those factors, and the Secretary would "explain in the denial how the institution failed to demonstrate that the program is likely to lead to gainful employment in a recognized occupation." *Id.* § 600.20(d)(1)(ii)(F)(*1*).

12

The final debt measure rule altered both the thresholds for the various debt measures and the consequences for failing them. The Department "replac[ed] the proposed two-tiered approach . . . with a single set of minimum standards. Under this simplified approach, the Department . . . establish[ed] a minimum standard of 35 percent for the loan repayment rate, and a maximum standard of 30 percent of discretionary income and 12 percent of annual earnings for the debt-to-earnings ratios." Debt Measure Rule, 76 Fed. Reg. at 34,395 (describing 34 C.F.R. § 668.7(a)(1)). As it had done in the notice of proposed rulemaking, the Department noted that "[t]he debt-to-earnings ratios were set after consideration of industry practice and expert recommendations." Debt Measure Rule, 76 Fed. Reg. at 34,395. The debt repayment rate was chosen because it identified "the approximately one quarter of programs" where the fewest former students were repaying their debts. *Id.* If a program satisfied any one of those standards, it would be "considered to provide training that leads to gainful employment in a recognized occupation." 34 C.F.R. § 668.7(a)(1). With exceptions not relevant here, a program would be considered to be failing if "its final debt measures do not meet any of the minimum standards." *Id.* at § 668.7(h). All failing programs would be required to warn their current and prospective students that the program had failed the debt measures, and to describe any actions that the institution planned to take to improve its performance. *Id.* at § 668.7(j)(1). A program that failed the debt measures in two out of any three years would need to provide additional warnings to its current and prospective students, including "[a] clear and conspicuous statement that a student who enrolls or continues in the program should expect to have difficulty repaying his or her loans." *Id.* at § 668.7(j)(2)(i)(D). A program that failed the debt measures in three out of any four years would lose its Title IV eligibility, *id.* at § 668.7(i), and the institution could not

"seek . . . to reestablish the eligibility of an ineligible program, or to establish the eligibility of a program that is substantially similar to the ineligible program" for three years.  § 668.7(l)(2)(ii).

## II. LEGAL STANDARD

"[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal.  The 'entire case' on review is a question of law," *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001), and the "complaint, properly read . . . presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action," *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993); *accord Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009); *Univ. Med. Ctr. of S. Nev. v. Shalala*, 173 F.3d 438, 440 n. 3 (D.C. Cir. 1999); *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996).  The district court's review "is based on the agency record and limited to determining whether the agency acted arbitrarily or capriciously," *Rempfer*, 583 F.3d at 865, or in violation of another standard set out in 5 U.S.C. § 706.

## III. ANALYSIS

The Association challenges the debt measure rule, the reporting and disclosure rule, and the program approval rule.  The court will consider each challenge in turn.

### A.  The Debt Measure Rule

#### i.  Statutory Authority

The Association first argues that the debt measure rule is "in excess of statutory . . . authority."  5 U.S.C. § 706(2)(C).  Such arguments are "reviewed under the well-known *Chevron* framework."  *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 2012 WL 1992003, at *9; *see Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 842–43 (1984).  "Under that

framework, '[i]f the intent of Congress is clear, . . . [a court] must give effect to the unambiguously expressed intent of Congress.'" *TNA Merchant Projects, Inc. v. FERC*, 616 F.3d 588, 591 (D.C. Cir. 2010) (quoting *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 842–43 (1984)) (alterations in *TNA*). "But 'if the statute is silent or ambiguous with respect to the specific issue,' the court must uphold the agency's interpretation as long as it is reasonable." *Id.* (quoting *Chevron*, 467 U.S. at 843); *see also Nat'l Cable & Telecomm. v. FCC*, 567 F.3d 659, 663 (D.C. Cir. 2009) ("If the statute is ambiguous enough to permit the agency's interpretation . . . [a court must] defer to that interpretation so long as it is reasonable.").

The Association argues that "gainful employment" unambiguously means "a job that pays," and that the Department's attempt to define the phrase in terms of debt and income therefore exceeds its statutory authority. The Association points to contemporary dictionaries, which define "gainful" as "productive of gain" or "providing an income." *See, e.g.*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 768 (3d ed. 1964). It also notes that the phrase "gainful employment" is used many times in Title 20, *see* 20 U.S.C. §§ 1036(e)(1)(B)(ii), 1134c(a), 1135c(d)(2), 1140(1)(B), 1140g(d)(3)(D), 1161g(d)(5)(B), 2208(a), 4706(a), 5605(a)(2)(B)—and each of those uses, the Association argues, means "a job that pays." Finally, the Association points to the Education Amendments of 1972, which altered the Vocational Education Act of 1963 to provide that employment as a volunteer fireman would be gainful employment for certain purposes. Pub L. No. 92-318, § 202(b), 86 Stat. 235, 325 (1972) (codified at 20 U.S.C. § 1248(1) (Supp. II 1972) (covering "program[s] designed to prepare individuals for gainful employment (including volunteer firemen)"). The Association argues that this amendment demonstrates the plain meaning of "gainful employment," since without the

amendment volunteer work would not have been considered gainful.  *See* S. Rep. No. 92-346, at 75 (1971) (noting that the amendment was necessary because "these firemen serve on a volunteer basis, without compensation" and so "are not gainfully employed as firemen and therefore their training cannot be considered fundable vocational education").  Conversely, the Association argues, paid work—any paid work—is gainful employment.

The Department replies that Congress did not provide a precise definition of what it means to "prepare students for gainful employment in a recognized occupation."  20 U.S.C. §§ 1001(b)(1), 1002(b)(1)(A)(i), (c)(1)(A).  The Department cites to many contemporary dictionaries that define "gainful" as "profitable" or "lucrative," thereby implying (the Department argues) an excess of returns over expenses.  *See, e.g.*, BLACK'S LAW DICTIONARY 807 (4th ed. 1951); WEBSTER'S NEW INTERNATIONAL DICTIONARY 1026 (2d ed. 1958); NEW STANDARD DICTIONARY 1000 (Funk & Wagnalls Co. 1946).  It also argues that the operative statutory phrase is not simply "gainful employment" but rather "gainful employment in a recognized occupation," and suggests that the fuller phrase connotes employment in an established occupation—and therefore, presumably, a decently paying one.  It further argues that "gainful employment" means something different in the context of fellowships for graduate study, for example, the recipients or which are generally barred from such employment, *see, e.g.*, 20 U.S.C. § 1036(e)(1)(B)(ii), than in the context of training for entrance into a recognized occupation.  The Department therefore concludes that the phrase "gainful employment in a recognized occupation" is ambiguous and that in enacting it Congress delegated interpretive authority to the Department, whose interpretation ought therefore to be evaluated under step two of the *Chevron* analysis.

16

The court agrees.  There is no unambiguous meaning of what makes employment "gainful": the phrase need not mean "any job that pays."  "Gainful employment" does not unambiguously encompass work for minimal gain, nor does it necessarily describe the gross profits from a given activity rather than the net gains derived therefrom.  Moreover—and more importantly—the relevant statutory command is that a given program "prepare students for gainful employment in a recognized occupation."  The Department's regulations are an attempt to assess whether certain programs in fact provide such preparation.  *See, e.g.*, Debt Measure Rule, 76 Fed. Reg. at 34,395 ("The Department [established the debt measures] with the goal of identifying programs that are failing to prepare students for gainful employment in a recognized occupation . . . .").  The real question, then, is not how much gain is enough but rather how much preparation is enough.  The Department has attempted to answer that question by reference to the economic success of a program's former students.  The statute does not "unambiguously foreclose[] the agency's interpretation," *Nat'l Cable*, 567 F.3d at 663, because it does not tell the Department how to determine which programs actually prepare their students and which programs do not.  "The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress."  *Chevron*, 467 U.S. at 843 (quoting *Morton v. Ruiz*, 415 U.S. 199, 231 (1974)) (ellipses in original).  The means of determining whether a program "prepare[s] students for gainful employment in a recognized occupation" is a considerable gap, which the Department has promulgated rules to fill.  The court therefore turns to the question of whether the Department has done so reasonably.

The Association musters many arguments that the Department has adopted an unreasonable interpretation.  First, the Association argues that the gainful employment regulations transform the statutory requirement that certain programs "*prepare* students for gainful employment" into a requirement that preparation in fact "*lead* to gainful employment." 34 C.F.R. § 668.7(a)(1) (emphasis added).  The Association notes that many factors—including individual choice and market demand—affect a former student's job prospects.  It further argues that the Department has impermissibly transformed an institutional requirement—that institutions provide "an eligible program of training," 20 U.S.C. §§ 1002(b)(1)(A), (c)(1)(A)—into an evaluation of each offered program.  Next, the Association contends that the Department's interpretation is foreclosed by the statutory cohort default rate test, 20 U.S.C. § 1085(a), which bars institutions with high student default rates from participating in certain Title IV programs.  The Association then argues that the debt measure rule is an "elephant in a mousehole"—a policy change so large that Congress could not have meant to authorize it in the statutory language on which the Department relies.  It also contends that the regulation frustrates Congress's intention in enacting the Higher Education Act by favoring programs that prepare students for high-paying jobs.  Finally, the Association argues that the Department's interpretation is unreasonable because it may produce absurd results in certain circumstances, such as when schools in different states offer identical programs and place graduates into the same sorts of jobs, but one program fails the debt measures because its local wage rate is lower. The Court considers each of these arguments in turn.

Although the Association rightly notes that the Higher Education Act only requires that certain programs prepare students for gainful employment and not that they guarantee it, the

adequacy of a program's preparation is difficult to measure—and it is reasonable to consider students' success in the job market as an indication of whether those students were, in fact, adequately prepared.  If "a program of training to prepare students for gainful employment," 20 U.S.C. § 1088(b)(1)(A)(i), does not in fact lead to jobs for any of its students, it is reasonable to conclude that those students were not truly prepared.  Moreover, a program-by-program evaluation of the sort that the Department has established in its gainful employment regulations is not foreclosed by the statutory formula that an institution becomes eligible by providing "an eligible program of training," 20 U.S.C. §§ 1002(b)(1)(A), (c)(1)(A).  The debt measure rule acknowledges that institutions subject to this requirement must "offer at least one eligible program . . . in order for the institution to be eligible."  Debt Measure Rule, 76 Fed. Reg. at 34,392.  Each program must therefore be evaluated for eligibility, and it is reasonable for the Department to conclude (as it has) that Title IV funds may only be used to pursue studies in an eligible program.  Indeed, to read the statute otherwise would allow an institution to receive federal funding for many ineligible programs simply because the institution also offered at least one eligible program.

Nor is the Department's interpretation unreasonable in light of the statutory cohort default rule.  The D.C. Circuit has held that the Department's authority to establish "reasonable standards of financial responsibility and appropriate institutional capability," 20 U.S.C. § 1094(c)(1)(B), empowers it to promulgate a rule that measures an institution's administrative capability by reference to its cohort default rate—even though the administrative test differs significantly from the statutory cohort default rate test.  *Career Coll. Ass'n v. Riley*, 74 F.3d 1265, 1272–75 (D.C. Cir. 1996); *compare* 34 C.F.R. § 668.16(m)(1)(i) (finding an institution

administratively capable if, *inter alia*, it had a cohort default rate below 25 percent in *each* of the three most recent fiscal years) *with* 20 U.S.C. § 1085(a)(2) (making an institution eligible for Title IV funding if, *inter alia*, it had an acceptable cohort default rate in *any* of the last three fiscal years).  If the statutory cohort default rule does not bar an administrative cohort default rule, it certainly does not prevent the Department from adopting the debt measures.

The debt measures are a significant regulatory intervention, but they do not suggest that the Department has found "an elephant in a mousehole."  That phrase entered the lexicon of administrative law in *Whitman v. American Trucking Associations, Inc.*, 531 U.S. 457 (2001), when the Supreme Court said that "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."  531 U.S. at 468.  The *Whitman* Court cited to *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000), for that proposition; there, the Court held that Congress had not delegated to the Food and Drug Administration the authority to regulate tobacco as a "drug" under the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.*—a power that the agency had always disavowed.  The Court concluded that "Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion."  529 U.S. at 160.  The *Whitman* Court also invoked *MCI Telecommunications Corporation v. American Telephone & Telegraph Company*, 512 U.S. 218 (1994), to establish that elephants do not hide in mouseholes.  In *MCI*, the Court held that the Federal Communications Commission's statutory authority to "modify any requirement" did not empower it to alter the requirement underpinning the rate regulation of common carriers.  *Id.* at 231 ("It is highly unlikely that Congress would leave the determination of whether an industry

will be entirely, or even substantially, rate-regulated to agency discretion—and even more unlikely that it would achieve that through such a subtle device as permission to 'modify' rate-filing requirements."). In *Whitman* itself, the Court concluded that since the power to consider costs when setting air quality standards was an "elephant"—that is, a major issue of public policy—and the statutory command to set those standards with "an adequate margin of safety" a "mousehole," it was "implausible that Congress would give to the EPA through these modest words the power to determine whether implementation costs should moderate national air quality standards." *Whitman*, 531 U.S. at 468.[4]

Neither the elephant nor the mousehole is present here. Although the Department's regulation is significant, it does not approach the scale of the elephantine interventions described above. Nor is the statutory language the Department invokes especially broad or obscure. Concerned about inadequate programs and unscrupulous institutions, the Department has gone looking for rats in ratholes—as the statute empowers it to do.

Finally, the court is unpersuaded by the Association's argument that the gainful employment regulation frustrates Congress's intention by favoring programs that prepare students for "high-paying jobs." Program Integrity: Gainful Employment, 75 Fed. Reg. at 43,667. Although the Department printed those words in its notice of proposed rulemaking, the final regulation only sets minimal earning and debt repayment standards. And the Association's argument that the regulation may produce absurd results in certain circumstances is better suited

---

[4] Applying this line of cases, the D.C. Circuit concluded that vague language in the Gramm-Leach-Bliley Financial Modernization Act, Pub. L. No. 106-102, 113 Stat. 1338 (1999), did not authorize the Federal Trade Commission to regulate attorneys engaged in the practice of law. *Am. Bar Ass'n v. FTC*, 430 F.3d 457, 467–73 (D.C. Cir. 2005).

to an as-applied challenge arising out of such circumstances.  "To prevail in . . . a facial

challenge" such as this one, a plaintiff "'must establish that no set of circumstances exists under

which the [regulations] would be valid.'"  *Ass'n of Private Sector Colls.*, 2012 WL 1992003, at

*10 (quoting *Reno v. Flores*, 507 U.S. 292, 301 (1993)) (alteration in original).  "[I]t is not

enough for" a plaintiff "to show the [challenged regulations] could be applied unlawfully."  *Id.*

(quoting *Sherley v. Sebelius*, 644 F.3d 388, 397 (D.C. Cir. 2011)) (alterations in original).

The gainful employment regulations are a reasonable interpretation of an ambiguous

statutory command: that the Department provide Title IV funding only to schools that "prepare

students for gainful employment in a recognized occupation."  The court turns to the

Association's arguments that those regulations were promulgated in an arbitrary and capricious

manner.

### ii.  Reasoned Decisionmaking

"To satisfy the APA's 'arbitrary and capricious' standard, an agency must 'articulate a

satisfactory explanation for its action including a "rational connection between the facts found

and the choice made."'" *Owner-Operator Independent Drivers Ass'n, Inc. v. Federal Motor

Carrier Safety Admin.*, 494 F.3d 188, 203 (D.C. Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n v.

State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United

States*, 371 U.S. 156, 168 (1962))).  "The 'agency must cogently explain why it has exercised its

discretion in a given manner,' and that explanation must be 'sufficient to enable [a court] to

conclude that the [agency's action] was the product of reasoned decisionmaking.'" *Owner-

Operator*, 494 F.3d at 203 (quoting *State Farm*, 463 U.S. at 48, 52).

The Association puts forward many arguments that the debt measure rule is arbitrary and capricious.  First, it argues that the rule departs from agency precedent without explanation.  Next, the Association contends that the debt measures are arbitrary because they do not actually assess whether a program prepares its students for gainful employment in a recognized occupation and moreover are based on bad data.  It further contends that the debt measures are arbitrarily or unconstitutionally retroactive. The Association argues that the rule is arbitrary in light of the statutory "90/10 rule" and the Department's inability to set a program's tuition.  It contends that the debt repayment test arbitrarily treats loans in deferment or forbearance and students who have not completed their program, while the debt-to-earnings tests consider an arbitrarily short window of time.  Finally, the Association argues that both the debt repayment test and the debt-to-earnings tests lack a reasoned basis.

Judicial "review under the APA is highly deferential, but agency action is arbitrary and capricious if it departs from agency precedent without explanation."  *Ramaprakash v. FAA*, 346 F.3d 1121, 1124 (D.C. Cir. 2003).  The Association argues that the Department has done just that, locating the agency's precedent in an administrative adjudication from 1994, *see In re Acad. for Jewish Educ.*, 1994 WL 1026087 (Dep't of Educ. Mar. 23, 1994), and a regulation requiring institutions to "determine the number of students who . . . obtained gainful employment in the recognized occupation for which they were trained or in a related comparable recognized occupation."  34 C.F.R. § 668.8(g)(1)(ii).  The administrative adjudication involved the question of whether a program in Jewish culture prepared its students for gainful employment in a recognized occupation.  The academy that offered the program argued that although it did not "train [its] students for any specific job" it nonetheless gave them "the basis of a very strong

Jewish education and a strong education in Jewish culture" that would prepare them for work in Jewish institutions.  *In re Acad. for Jewish Educ.*, 1994 WL 1026087, at *2.  The Department ruled that because the aim of the program was "assimilation into a particular culture, not [preparation for] a specific area of employment," *id.* at *3, it did not prepare its students for gainful employment in a recognized occupation.  The Department, the Association notes, did not discuss the debt taken on by those students nor their subsequent earnings nor debt payments.  But that is unsurprising.  The administrative law judge did not offer a full definition of what it meant to prepare a student for gainful employment in a recognized occupation—to the contrary, he noted that it was "difficult to objectively assess what, per se, prepares one for 'gainful employment in a recognized occupation,'" *id.* at *2—but merely held that such preparation must be for "a specific area of employment," *id.* at *3.  The Department has not departed from that interpretation.  Nor is the Department's regulation requiring schools to report whether *individual students* have *attained* gainful employment counter to its attempt to use the debt measures to identify *programs* that offer *adequate preparation* for such employment.

The Association next argues that the debt measures are arbitrary because they do not actually assess whether a program prepares its students for gainful employment in a recognized occupation.  Instead, the Association argues, the debt measures merely reflect the underlying demographics of a program's student population, or the professional choices that students make after leaving the program, or the economic conditions in which they make those choices.  The Department considered similar comments when it promulgated the debt measure rule.  In response to commenters' suggestions that institutions that enrolled more minorities or more students receiving Pell Grants (a barometer of economic need) would more often fail the debt

measures, the Department performed a series of multivariate regression analyses.  It concluded

that "there is only a modest relationship between repayment rates and an institution's student

demographics" because "the percentage of students receiving Pell Grants explains 23 percent of

the total variance in repayment rates."  Debt Measure Rule, 76 Fed. Reg. at 34,462.  The

percentage of students that are members of a minority group explained twenty percent of the

total variance in repayment rates.  Decl. of Eduardo Ochoa, Ex. A (Dec. 13, 2011).[5]  The

Department further found "a wide variation in performance on the debt-to-earnings ratio among

programs serving similar groups of students."  Debt Measure Rule, 76 Fed. Reg. at 34,464.

---

[5] Although this is the correct figure, the Department erroneously determined that "[t]he percentage of the students that are members of a minority group explains 1 percent of the total variance in repayment rates."  Debt Measure Rule, 76 Fed. Reg. at 34,462.  That calculation was incorrect, *see* Decl. of Eduardo Ochoa (Dec. 13, 2011), but the rule need not be remanded on that basis.  "Under the APA, courts must take 'due account' of 'the rule of prejudicial error.'" *Gerber v. Norton*, 294 F.3d 173, 182 (D.C. Cir. 2002) (quoting 5 U.S.C. § 706).  Although "remand is required 'when there is substantial doubt that the administrative agency would have reached the same result it did absent'" the error, in the absence of substantial doubt remand is unnecessary.  *Chem. Waste Mgmt., Inc. v. EPA*, 976 F.2d 2, 32 (D.C. Cir. 1992) (per curiam) (quoting *Consolidated Gas Supply v. FERC*, 606 F.2d 323, 329 (D.C. Cir. 1979)); *accord Wilkinson v. Legal Servs. Corp.*, 27 F. Supp. 2d 32, 64 (D.D.C. 1998).  The Department determined that although "the percentage of students receiving Pell Grants explains 23 percent of the total variance in repayment rates," the "relationship between repayment rates and an institution's student demographics" was "modest."  Debt Measure Rule, 76 Fed. Reg. at 34,462.  If twenty-three percent explanatory power was "modest," then surely the Department would, as it argues, have found the weaker—and non-additive—relationship between minority group membership and repayment rates to be modest as well.  *See* Decl. of Eduardo Ochoa at ¶ 11 n.1 ("The percent of total variance figures are not additive.  Thus, it would be incorrect to conclude that minority enrollment and Pell rates together explain 43% of the total variance, even though Pell rates examined individually explain 23% and minority enrollment examined individually explains 20%.").

The Department's use of a data set from Missouri to fill gaps in its own data was similarly permissible.  When the Department was developing its regulations, it has explained, the Missouri data set was the besst State database available for certain purposes—there was no adequate national database—and the "use of the best available data is firmly recognized by the case law," even when that data is imperfect.  *Baystate Medical Ctr. v. Leavitt*, 545 F. Supp. 2d 20, 50 (D.D.C. 2008).

Many programs serving large numbers of students receiving Pell Grants nonetheless passed the debt-to-earnings tests as well.  *Id.* at 34,465.  The Department's determination that the debt measures appropriately measured whether a program prepared its students for gainful employment in a recognized occupation rather than a program's demographics was therefore not arbitrary.  Nor was its decision to promulgate tests affected by students' professional choices arbitrary: the D.C. Circuit has already rejected that argument in an analogous context.  *See Ass'n of Accredited Cosmetology Schools v. Alexander*, 979 F.2d 859, 866 (D.C. Cir. 1992) (holding that it was "clearly rational" for Congress and the Department to "solve the problem of increasing . . . defaults by eliminating schools evidencing a disproportionately large share of the defaults" even though such an action would "punish *schools* for their *students'* rates of default").  Finally, the fact that the debt measures may perform differently at different points in the economic cycle does not make them arbitrary on their face.

Nor are the debt measures arbitrarily or unconstitutionally retroactive, because they do not alter "the past legal consequences of past actions."  *Nat'l Cable & Telecomm. Ass'n v. FCC*, 567 F.3d 659, 670 (D.C. Cir. 2009).  "A law is 'retroactive' if it '"takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past.""  *Ass'n of Accredited Cosmetology Schools*, 979 F.2d at 864 (quoting *Neild v. District of Columbia*, 110 F.2d 246, 254 (D.C. Cir. 1940) (quoting *Society for Propagating the Gospel v. Wheeler*, 22 F.Cas. 756, 767 (C.C.D.N.H. 1814) (Story, J.))).  But "schools have no 'vested right' to future eligibility to participate" in Title IV programs, *id.*, and a regulation is not retroactive "merely because the facts or requisites upon which its subsequent action depends . . . are drawn from a time

antecedent" to its promulgation, *id.* at 865 (quoting *Reynolds v. United States*, 292 U.S. 443, 449 (1934)).  The debt measures look to the recent performance of a program's former students in order to determine whether that program will, in the future, be eligible to receive Title IV funds. "[T]erminating . . . schools' *future* participation in the Title IV . . . programs based on their past track record . . . cannot amount to retroactive application under *Association of Accredited Cosmetology Schools*."  *Career Coll. Ass'n v. Riley*, 1994 WL 396294, at *5 n.7 (D.D.C. July 19, 1994), *aff'd* 70 F.3d 637 (D.C. Cir. 1995) (unpublished).  Nor are the debt measures secondarily retroactive.  Impermissible secondary retroactivity can arise when a regulation "impair[s] the future value of a past bargain," *Nat'l Cable*, 567 F.3d at 670, by, for instance, altering the value of a contract or license entered into under a prior regulatory scheme.  "Because there were no prior rules that related to the [gainful employment] regulation[s] at issue in this case, plaintiffs cannot claim they have incurred any past investment in reliance on any rule."  *Career Coll. Ass'n*, 1994 WL 396294, at *5.

The Association argues that the debt measures are arbitrary in light of the statutory "90/10 rule" and the Department's inability to set a program's tuition, and that the debt repayment test arbitrarily treats loans in deferment or forbearance and students who have not completed their program, while the debt-to-earnings tests consider an arbitrarily short window of time.  The court rejects those arguments.  By statute, proprietary institutions of higher education—most of whose programs are gainful employment programs—lose their Title IV eligibility if more than 90% of their revenue comes from Title IV funds for two consecutive years.  20 U.S.C. § 1094(a)(24).  The Department considered the interaction of the debt measures and this 90/10 rule and reasonably concluded that "it is entirely possible to meet both the 90/10

requirements of the existing statute and the final repayment rate thresholds in these final regulations." Debt Measure Rule, 76 Fed. Reg. at 34,413. The Association has not presented any convincing arguments to the contrary. The debt repayment test rationally considers student loans that are in deferment of forbearance not to be in repayment, explaining that "deferments, forbearances, and other program benefits are necessary to assist borrowers in loan repayment, but particularly heavy reliance on these tools among former students of a particular program raise[s] questions about the performance of that program." Id. at 34,409. And the Department rationally concluded that considering a significantly longer earnings window in calculating the debt-to-income tests could "weaken or sever" the connection between earnings and education. Id. at 34,419.

Finally, the Association argues that the Department has not provided explanations of either the loan repayment test or the debt-to-income tests that are sufficient for the court to conclude that the tests are the product of reasoned decisionmaking. The debt-to-earnings ratios were established "after consideration of industry practice and expert recommendations." Debt Measure Rule, 76 Fed. Reg. at 34,395. Those experts suggested that 20 percent was the maximum affordable ratio of debt payments to discretionary income, id. at 34,397, and noted that 8 percent is a commonly used industry standard for a manageable ratio of debt to total income, id. at 34,398. "[B]ecause a gainful employment program would fail the discretionary income ratio [test] whenever the income of the students who completed the program was less than 150 percent of the poverty guideline"—the line above which income begins to be discretionary—the Department employed the tests in tandem. Id. at 34,397–98. "Programs whose graduates have low earnings relative to debt would benefit from the calculation based on

total income, and programs whose graduates have higher debt loads that are offset by higher earnings would benefit from the calculation based on discretionary income." *Id.* at 34,398. Having established those baselines, the Department then increased them by 50 percent—to 30 percent of discretionary income and 12 percent of annual earnings—to "provide a tolerance . . . over the baseline amounts . . . as well as account for former students who completed a program but who may have left the workforce or are working part-time." *Id.* at 34,400.

The debt repayment rate was chosen because it identified "the approximately one quarter of programs" where the fewest former students were repaying their debts. *Id.* at 34,395. The bottom quartile was chosen in an "attempt[] to define a relatively small subset of programs that could potentially lose eligibility" while also "balanc[ing] that concern against the need to make the measure a meaningful performance standard." *Id.* at 34,397.[6] The Department does not identify any expert studies or industry practices indicating that a repayment rate of 35 percent would be a "meaningful performance standard," but rather emphasizes that the number was chosen because approximately one quarter of gainful employment programs would fail a test set at that level. *See id.* at 34,397 ("Setting the threshold for eligibility at 35 percent identified approximately the lowest-performing quarter of programs."); *id.* ("Although we have revised the methodology for calculating the repayment rate, the 35 percent threshold remains close to the 25th percentile among gainful employment programs."); *id.* at 34,399 (noting that "the loan repayment rate threshold" of "35 percent . . . approximated the 25th percentile of the distribution of repayment rates"); *id.* at 34,400 ("For the loan repayment rate, the 35 percent threshold

---

[6] The Department described its development of the proposed debt repayment test in this way, and noted that "[a] similar approach was taken in developing the repayment rate threshold in these final regulations." Debt Measure Rule, 76 Fed. Reg. at 34,397.

continues to represent the 25th percentile of repayment rates rounded to the nearest 5 percent
. . . .").

When an agency "must select some[] necessarily somewhat arbitrary figure" in
establishing bright-line rules, a court "will defer to [its] expertise if it provides substantial
evidence to support its choice and responds to substantial criticism of that figure."  *United
Distribution Cos. v. FERC*, 88 F.3d 1105, 1141 n.45 (D.C. Cir. 1996).  Such rules "generally do
not violate the APA's deferential arbitrary-and-capricious standard . . . so long as those rules fall
within a zone of reasonableness and are reasonably explained."  *Emily's List v. FEC*, 581 F.3d 1,
22 n.20 (D.C. Cir. 2009).  "But where an agency has articulated no reasoned basis for its
decision . . . we will not 'abdicate the judicial duty carefully to "review the record to ascertain
that the agency has made a reasoned decision based on reasonable extrapolations from some
reliable evidence.""" *Tripoli Rocketry Ass'n, Inc. v. ATF*, 437 F.3d 75, 83 (D.C. Cir. 2006)
(quoting *Am. Mining Cong. v. EPA*, 907 F.2d 1179, 1187 (D.C. Cir. 1990) (quoting *Natural Res.
Def. Council v. EPA*, 902 F.2d 962, 968 (D.C. Cir. 1990) (internal quotation marks omitted))).
The question before the court is whether the Department has provided a reasoned basis for
selecting the debt repayment and debt-to-income standards.

The debt-to-income standards were based upon expert studies and industry
practice—objective criteria upon which the Department could reasonably rely.  That some
commenters criticized those standards does not invalidate the rule, but only places a burden on
the Department to respond to that criticism.  *See United Distribution Cos.*, 88 F.3d at 1141 n.45.
The Department did so.  *See* 76 Fed. Reg. 34,395–400.  The debt to income standards were the
product of a "rational connection between the facts found and the choice made," *State Farm*,

463 U.S. at 43, and the APA demands no more.  The debt repayment standard, by contrast, was

not based upon any facts at all.  No expert study or industry standard suggested that the rate

selected by the Department would appropriately measure whether a particular program

adequately prepared its students.  Instead, the Department simply explained that the chosen rate

would identify the worst-performing quarter of programs.  Why the bottom quarter?  Because

failing fewer programs would suggest that the test was not "meaningful" while failing more

would make for too large a "subset of programs that could potentially lose eligibility."  Debt

Measure Rule, 76 Fed. Reg. at 34,397.  That this explanation could be used to justify any rate at

all demonstrates its arbitrariness.  If the Department had chosen to disqualify the bottom ten

percent of programs, or the bottom half, it would have offered the same rationale: the rate chosen

disqualified the percentage of programs that it was intended to disqualify, and to have

disqualified fewer would have made the test too lenient while disqualifying more would have

made the requirement too stringent.  This is not reasoned decisionmaking.  "As an expert agency,

[the Department's] job is to make rational and informed decisions on the record before it in order

to achieve the principles set by Congress.  Merely . . . picking a compromise figure is not

rational decisionmaking." *Qwest Corp. v. FCC*, 258 F.3d 1191, 1202 (10th Cir. 2001).  In

setting the debt repayment rate, the Department picked a palatable figure.  Because the

Department has not provided a reasonable explanation of that figure, the court must conclude

that it was chosen arbitrarily.  *See U.S. Air Tour Ass'n v. FAA*, 298 F.3d 997, 1019 (D.C. Cir.

2002) ("[I]n the absence of any reasonable justification," the court "must conclude that this

aspect of the [rule] is arbitrary and capricious. . . .").

The repayment rate test cannot be severed from the other debt measures.  "Whether an administrative agency's order or regulation is severable, permitting a court to affirm it in part and reverse it in part, depends on the issuing agency's intent."  *Davis Cty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1459 (D.C. Cir. 1997) (quoting *North Carolina v. FERC*, 730 F.2d 790, 795–96 (D.C. Cir. 1984)).  That the component parts of a regulation are "intertwined . . . gives rise to a substantial doubt that a partial affirmance would comport with the [agency's] intent."  *Telephone & Data Sys., Inc. v. FCC*, 19 F.3d 42, 50 (D.C. Cir. 1994).  Because the Department has repeatedly emphasized the ways in which the debt repayment and debt-to-income tests were designed to work together, *see* Debt Measure Rule, 76 Fed. Reg. at 34,394–400, the tests are obviously "intertwined"—and so the court cannot sever one from the others.  The entire debt measure rule must therefore be vacated and remanded to the Department.[7]  *See Harmon v.*

---

[7] Because the court vacates and remands the entire regulation, it need not address the Association's argument that the debt measures violate the First Amendment by requiring that programs that fail the debt measure test in two out of three years must disclose that "a student who enrolls or continues to enroll in the program should expect to have difficulty repaying his or her student loans."  Debt Measure Rule, 76 Fed. Reg at 34,432.  The government may require the commercial disclosure of "purely factual and uncontroversial information" as long as there is a rational justification for the means of disclosure and it is intended to prevent consumer confusion, *see Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985), but the court doubts that the statement that every student in a program "should expect to have difficulty repaying his or her student loans" is a purely factual one.

Neither need the court address the Association's argument that the debt measures violate the Fifth Amendment by not allowing schools to contest the accuracy of data that could be used to sanction them.  The Fifth Amendment protects against the deprivation of property without due process of law, but (as discussed above) the D.C. Circuit has held that schools have no "vested interest" in their ability to receive Title IV funds.  *Ass'n of Accredited Cosmetology Schools*, 979 F.2d at 867.  Any property right is necessarily a "vested interest"; courts use the terms interchangeably.  *See, e.g.*, *Ganadera Indus., S.A. v. Block*, 727 F.2d 1156, 1160 (D.C. Cir. 1984) (concluding that a party without a "vested right" has "no constitutionally-protected property interest").  Without a property right in their participation in Title IV programs, schools cannot press a Fifth Amendment challenge to the regulation of those programs.

*Thornburgh*, 878 F.2d 484, 495 (D.C. Cir. 1989) ("When a court finds that an agency regulation is invalid in substantial part, and that the invalid portion cannot be severed from the rest of the rule, its typical response is to vacate the rule and remand to the agency.") (footnotes omitted).

### B.  The Reporting and Disclosure Rule

#### i.  Reporting

The court turns to the reporting and disclosure rule.  The Association argues that this rule must also be vacated because it is "centered on" the debt measure rule, *see Nat'l Mining Ass'n v. Dep't of Interior*, 105 F.3d 691, 696 (D.C. Cir. 1997), and because the Higher Education Act prohibits "the development, implementation, or maintenance of a Federal database of personally identifiable information on individuals receiving assistance under this chapter" unless that information "is necessary for the operation of programs authorized by" Title IV (among other subchapters).  20 U.S.C. § 1015c(a), (b)(1).  The regulation requires that institutions report, among other things, "[i]nformation needed to identify [a] student and the institution the student attended."  34 C.F.R. § 668.6(a)(1)(i).  The Department argues that the resulting database "is necessary for the operation of" the debt measures, and that it therefore falls within a statutory exception to the prohibition on maintaining databases of personally identifiable information.  *See* 20 U.S.C. § 1015c(b)(1).  As the debt measures have been vacated, that argument has little force—and the Department cannot show that the database it would maintain is necessary for the operation of any other Title IV program.[8]  The reporting portion of the reporting and disclosure

---

[8] The court further notes that 20 U.S.C. § 1015c(b)(2), which limits such databases to "a system (or successor system) that . . . was in use by the Secretary . . . as of the day before August 14, 2008" presents a difficult issue that the Department's interpretation—which would seem to swallow the exception by allowing the Secretary to fold any new database into an existing one—does not fully address.

rule, 34 C.F.R. § 668.6(a), will therefore be vacated because it is "not in accordance with" 20

U.S.C. § 1015c.  *See* 5 U.S.C. § 706(2)(A).

### ii. Disclosure

The disclosure portion of the rule, however, does not run afoul of that statutory

prohibition.  *See* 34 C.F.R. § 668.6(b)–(c).  It does not require gainful employment programs to

report information to the Department, but only to disclose it to their prospective students.  Those

disclosures must include the occupation that the program prepares students to enter, the on-time

graduation rate for students completing the program, the tuition and fees charged, and the

placement rate and median loan debt for students completing the program.  *See* 34 C.F.R. §

668.6(b).  Although the Association again argues that the disclosure requirements are "centered

on" the debt measure rule, *see Nat'l Mining Ass'n*, 105 F.3d at 696, the Department has broad

authority "to make, promulgate, issue, rescind, and amend rules and regulations governing the

manner of operation of, and governing the applicable programs administered by, the

Department."  20 U.S.C. § 1221e-3 (2006); *see also id.* § 3474 ("The Secretary is authorized to

prescribe such rules and regulations as the Secretary determines necessary or appropriate to

administer and manage the functions of the Secretary or the Department.").  The disclosures

mandated here fall comfortably within that regulatory power, and are therefore within the

Department's authority under the Higher Education Act.

Finally, the disclosure requirements are not arbitrary and capricious.  The Association

argues that because the on-time graduation rate disclosure mandated by the reporting and

disclosure rule, *see* 34 C.F.R. § 668.6(b)(1)(ii), (c), differs significantly from the graduation rate

disclosure required by the Student Right to Know and Campus Security Act of 1990, 20 U.S.C. §

1092, the new disclosure will arbitrarily confuse students.  The Student Right to Know Act requires that schools disclose the completion rate of full-time, first-time undergraduate students and defines completion as graduation within 150% of the normal time for completion.  20 U.S.C. § 1092(a)(1)(L), (a)(3).  The reporting and disclosure rule, on the other hand, requires schools to disclose the on-time completion rate for students in gainful employment programs, defining on-time completion as graduation from a program within the normal time for completing that program.  34 C.F.R. § 668.6(b)(1)(ii), (c).  It was not arbitrary for the Department to determine that schools should disclose their on-time completion rates to "all students" considering gainful employment programs, Reporting and Disclosure Rule, 75 Fed. Reg. at 66,838, rather than simply first-time, full-time undergraduates (as the Student Right to Know Act limits the disclosure).  Nor was it arbitrary for the Department to determine that those students should be informed of how many potential peers "completed the program no later than its published length."  *Id.*  The Department considered and responded to concerns about the interaction of the new disclosure requirements and the Student Right to Know Act, *see id.* at 66,838–39, and it is not this court's role to second-guess the Department's policy judgment that the value of the additional disclosures outweighed the potential confusion that could result from the interaction of the disclosures.

Nor is the Department's treatment of students who transfer within an institution arbitrary.  As the Department has explained, in some circumstances there may be an incentive to shift students between programs to mask the true performance of a particular program.  *Cf.* Debt Measure Rule, 76 Fed. Reg. at 34,417.  The Department therefore decided not to re-start the on-

time completion clock for students that change programs within an institution.  *See* Reporting

and Disclosure Rule, 75 Fed. Reg. at 66,839.

### iii. Severability

The disclosure requirements are not so intertwined with the reporting requirements as to

raise "a substantial doubt that a partial affirmance would comport with the [agency's] intent."

*Telephone & Data Sys.*, 19 F.3d at 50.  The Department intended to use the reported data "to

assess the outcomes of programs that lead to gainful employment in a recognized occupation."

Program Integrity Issues, 75 Fed. Reg. at 34,809 (June 18, 2010).  The disclosures, by contrast,

were intended "to better inform prospective students."  *Id.*  Because there is no reason to think

that the Department's desire to see prospective students better informed about the programs they

are considering was in any way dependant upon its intention to conduct its own assessments of

those programs, the reporting requirements will be severed from the reporting and disclosure

rule.  Only the reporting requirements, 34 C.F.R. § 668.6(a), are vacated and remanded to the

Department.

### C.  The Program Approval Rule

Finally, the Court considers the program approval rule, which requires that institutions

operating gainful employment programs notify the Department and, if the Department so

demands, obtain its approval for new gainful employment programs.  34 C.F.R. §§ 600.10(c),

600.20(d).  Such applications would only be denied based on "[w]hether the additional

educational program is one of several new programs that will replace similar programs currently

provided by the institution, as opposed to supplementing or expanding the current programs

provided by the institution," "[w]hether the number of additional educational programs being

added is inconsistent with the institution's historic program offerings, growth, and operations," and "[w]hether the process and determination by the institution to offer an additional educational program that leads to gainful employment in a recognized occupation is sufficient."  *Id.* § 600.20(d)(1)(ii)(E).  The Association argues that the program approval rule must fall along with the debt measures and, moreover, that it is affirmatively barred by 20 U.S.C. § 1232a, which prohibits the Department from exercising "any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution."  Because the court accepts the first argument, it need not reach the second, broader one.[9]

> In promulgating the program approval rule, the Department explained that it was:
>
> concerned that some institutions might attempt to circumvent the proposed gainful employment standards . . . by adding new programs before those standards would take effect.  Although the proposed standards would evaluate most programs based on past performance, newly offered programs would not be subject to the standards for several years until they established an operating history.  For example, an institution may seek to offer a significant number of new programs that would not be evaluated under the new standards for up to five years as a contingency plan in case its current programs are eliminated or restricted under measures that would be established in the final gainful employment regulations.  We believe that such an approach by an institution should be examined closely to determine whether those

---

[9] The court notes, however, that the broader argument is not frivolous.  The program approval rule requires any school that wishes to offer a Title IV-eligible gainful employment program to submit an application to the Secretary, who can wait until a month before the beginning of class to decide whether he will examine the program more closely.  *See* 34 C.F.R. §§ 600.10(c)(1), 600.20(d)(1)(ii)(B).  If he decides to take a closer look, he can reject an application because he finds "the process and determination by the institution" to be "[in]sufficient."  *Id.* § 600.20(d)(1)(ii)(E)(*4*).  A school submitting a new program for approval must "[d]escribe . . . how the institution determined the need for the program and how the program was designed to meet . . . market needs."  *Id.* § 600.20(d)(2)(i).  For the Secretary to have the power to perform an evaluation of the market demand for every new gainful employment program brings him dangerously close to exercising "supervision . . . over the . . . program of instruction . . . of an[] educational institution."  20 U.S.C. § 1232a.  A proposed revision to the program approval rule would substantially narrow the Secretary's power.  *See* Application and Approval Process for New Programs, 76 Fed. Reg. 59,864, 59,877 (Sept. 27, 2011) (proposing amendments to 34 C.F.R. §§ 600.10, 600.20).

> new programs are substantially different and offer more potential benefits to its students. With these regulations, the Department intends to mitigate the potential for this type of response by identifying such circumstances and requiring those new programs to be approved.

Program Approval Rule, 75 Fed. Reg. at 66,669–70.  As the debt measures have been vacated, the danger that schools would circumvent them can no longer animate the program approval rule. The Department's defense of the program approval and its recent proposal to amend it, *see* Application and Approval Process for New Programs, 76 Fed. Reg. 59,864 (Sept. 27, 2011), demonstrate that the current program approval process is truly "centered on" the debt measures; the program approval rule will therefore be vacated as well.  *See Nat'l Mining Ass'n*, 105 F.3d at 696.

## IV. CONCLUSION

The Department has set out to address a serious policy problem, regulating pursuant to a reasonable interpretation of its statutory authority.  But it has failed to provide a reasoned explanation for a core element of its central regulation.  Both that regulation and those that depend upon it must therefore be vacated.  Because the disclosure requirements, 34 C.F.R. § 668.6(b), are not so intertwined with the vacated debt measure, they will remain in effect.

Rudolph Contreras
United States District Judge

Date: June 30, 2012