UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSOCIATION OF PRIVATE SECTOR COLLEGES AND UNIVERSITIES,<br><br>    Plaintiff,<br><br>    v.<br><br>ARNE DUNCAN, in his official capacity as Secretary of the Department of Education,<br><br>and<br><br>UNITED STATES DEPARTMENT OF EDUCATION,<br><br>    Defendants. | Civil Action 11-1314 (RC) |

**MEMORANDUM OPINION**

The Department of Education and its Secretary (collectively, "the Department") have moved the court to amend its judgment, which vacated 34 C.F.R. §§ 600.10(c), 600.20(d), 668.6(a), and 668.7. The Department argues that the disclosures required by 34 C.F.R. § 668.6(b)(1)(v), which the court upheld, cannot be fully effective without both the vacated reporting requirements, 34 C.F.R. § 668.6(a), and portions of the vacated debt measures, 34 C.F.R. §§ 668.7(a)(2), (b)–(f). For the reasons set out below, the Department's motion will be denied.

**I. BACKGROUND**

The Association of Private Sector Colleges and Universities (the "Association") brought this suit to challenge three related regulations governing institutions of higher education that

must "prepare students for gainful employment in a recognized occupation" in order for those students to receive federal funds under Title IV of the Higher Education Act. 20 U.S.C. §§ 1001(b)(1), 1002(b)(1)(A)(i), (c)(1)(A). One regulation established reporting and disclosure requirements for such institutions, 34 C.F.R. § 668.6, another attempted to assess whether programs were in fact preparing their students for gainful employment by examining the income earned and debt repaid by students after leaving the programs, 34 C.F.R. § 668.7, and a third required schools to submit new gainful employment programs to the Department for its approval, 34 C.F.R. §§ 600.10(c), 600.20(d). The court vacated the debt measures, 34 C.F.R. § 668.7, because the Department lacked a reasoned basis for one of the three debt and income tests established therein;[1] the other tests, though supported by reasoned decisionmaking, were inextricably intertwined with the third and therefore vacated along with it.

Turning to the reporting requirements, 34 C.F.R. § 668.6(a), which mandated that institutions report, among other things, "[i]nformation needed to identify [a] student and the

---

[1] The court did not, as the Department suggests, Defs.' Mot. at 3, reject that test—the "debt repayment" test—because the Department failed to support it by reference to expert studies or industry practices. The Department was, of course, under no obligation to produce such studies or industry standards. Rather, its burden was to "cogently explain why it . . . exercised its discretion in a given manner," so that the court could "conclude that the [agency's action] was the product of reasoned decisionmaking." *Assoc. of Private Sector Colleges & Univs. v. Duncan*, 870 F. Supp. 2d 133, 149 (D.D.C. 2012) (quoting *Owner-Operator Independent Drivers Ass'n, Inc. v. Federal Motor Carrier Safety Admin.*, 494 F.3d 188, 203 (D.C. Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 48, 52 (1983))) (second alteration in original). The court found that the Department had based one test on expert opinion and another on industry standards, and that each basis was sufficient to show that the agency's action was the product of reasoned decisionmaking. But the court did not suggest that either studies or industry standards were necessary components of reasoned decisionmaking. The debt repayment test was vacated because the Department could not justify it by reference to studies or industry standards *or anything else*, except its arbitrary determination that one-quarter of programs should fail.

institution the student attended," *id.* § 668.6(a)(1)(i)(A), the court said that "the Higher Education Act prohibits 'the development, implementation, or maintenance of a Federal database of personally identifiable information on individuals receiving assistance under this chapter' unless that information 'is necessary for the operation of programs authorized by' Title IV (among other subchapters)." *Assoc. of Private Sector Colleges & Univs. v. Duncan*, 870 F. Supp. 2d 133, 155 (D.D.C. 2012) ("*APSCU*") (quoting 20 U.S.C. §§ 1015c(a), (b)(1)). Although the Department argued that the information to be collected under the reporting requirements was "necessary for the operation of" the debt and income tests, the court noted that once those tests were vacated, that argument had little force. Referring to that newly-collected information—which was to be stored in the National Student Loan Data System, a Congressionally-mandated database containing extensive information about the beneficiaries of Title IV programs, *see* 20 U.S.C. § 1092b—as "the database [that the Department] would maintain," the Court concluded that "the Department cannot show that the database it would maintain is necessary for the operation of any other Title IV program," and therefore vacated the reporting requirements as contrary to the prohibition of 20 U.S.C. § 1015c. *APSCU*, 870 F. Supp. 2d at 155. The court further noted its concern that that statutory provision, which only allows the Department to develop, implement, or maintain "a Federal database of personally identifiable information on individuals receiving assistance under this chapter," 20 U.S.C. § 1015c(a), if that database is "a system (or a successor system) that . . . was in use by the Secretary . . . as of the day before August 14, 2008," *id.* § 1015c(b), (2), not be interpreted to allow the Department to "fold any new database into an existing one" and thereby evade the statutory limitation, *APSCU*, 870 F. Supp. 2d at 155 n.8.

The disclosure requirements, 34 C.F.R. § 668.6(b)–(c), by contrast, did "not run afoul of th[e] statutory prohibition" set out in 20 U.S.C. § 1015c because they did not require the creation of any database. *APSCU*, 870 F. Supp. 2d at 155–56.  The court found that the disclosure requirements were authorized by the Department's "broad authority 'to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department,'" *APSCU*, 870 F. Supp. 2d at 156 (quoting 20 U.S.C. § 1221e-3), and that they were neither arbitrary nor capricious.  It further found that the disclosure requirements were severable from the reporting requirements, and so left them in place.  *Id.* at 156–57.  Finally, the court vacated the program approval rule, 34 C.F.R. §§ 600.10(c), 600.20(d), because it was "centered on" the vacated debt measures set out in 34 C.F.R. § 668.7.  *APSCU*, 870 F. Supp. 2d at 157–58.

The Department now moves the court to reinstate the reporting requirements, 34 C.F.R. § 668.6(a), and portions of the debt measures, 34 C.F.R. §§ 668.7(a)(2), (b)–(f), arguing that those regulations are necessary for the operation of the disclosure requirements, 34 C.F.R. § 668.6(b)–(c), which are in turn necessary for the operation of Title IV programs, and that reinstating them would not require the Department to create a new database of personally identifiable information about students in violation of 20 U.S.C. § 1015c(b)(2).  With this motion, the Department does not challenge the court's determination that the debt repayment test contained an arbitrary threshold, nor that the program approval rule could not stand without the debt measures.

## II.  LEGAL STANDARD

Rule 59(e) permits a court to alter or amend a judgment.  FED. R. CIV. P. 59(e).  "A Rule 59(e) motion is discretionary and need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (per curiam) (internal quotation marks omitted).

## III.  ANALYSIS

This motion arises from a basic tension in the court's judgment.  In its earlier opinion, the court upheld 34 C.F.R. § 668.6(b)(1)(v), which requires covered institutions to disclose to their prospective students "[t]he median loan debt incurred by students who completed the program *as provided by the Secretary*, as well as any other information the Secretary provided to the institution about that program."  34 C.F.R. § 668.6(b)(1)(v) (emphasis added).  But the court vacated 34 C.F.R. § 668.6(a)(1)(i)(C)(2), which required those institutions to report to the Department "[t]he amounts [that any student who completed a covered program during the award year] received from private education loans and the amount from institutional financing plans that the student owes the institution upon completing the program."  The Department argues that, unless it receives that information, it cannot in turn provide covered schools with the median loan debt data that they are required to disclose to their prospective students.  The Department also notes that schools are required to disclose "any other information the Secretary provided to the institution about th[e] program" that a prospective student is considering.  34 C.F.R. § 668.6(b)(1)(v).  The Department intended to provide schools with data regarding their performance on the vacated debt measures, which the schools would then have been required to

disclose to their prospective students. The Department asks the court to revive the reporting requirements so that it can accurately calculate the median loan debt of the former students of gainful employment programs, and to revive portions of the debt measures, so that it can use the formulas contained therein to calculate the debt repayment rate and debt-to-income ratios of those former students, and require institutions to disclose the same.

The strength of the Department's motion depends primarily on the proper interpretation of 20 U.S.C. § 1015c, which is titled "Database of student information prohibited" and reads in relevant part:

> (a) Prohibition
>
> Except as described in subsection (b), nothing in this chapter shall be construed to authorize the development, implementation, or maintenance of a Federal database of personally identifiable information on individuals receiving assistance under this chapter, attending institutions receiving assistance under this chapter, or otherwise involved in any studies or other collections of data under this chapter, including a student unit record system, an education bar code system, or any other system that tracks individual students over time.
>
> (b) Exception
>
> The provisions of subsection (a) shall not apply to a system (or a successor system) that--
>
> (1) is necessary for the operation of programs authorized by subchapter II, IV, or VII of this chapter; and
>
> (2) was in use by the Secretary, directly or through a contractor, as of the day before August 14, 2008.

In brief, 20 U.S.C. § 1015c prohibits the creation of new "Federal database[s] of personally identifiable information" about students at post-secondary institutions, as well as the maintenance of any such pre-existing database that is not "necessary for the operation of

6

programs authorized by" Titles II, IV, or VII of the Higher Education Act. The court will review the history of this provision before discussing its implications.

      A.    **The Evolution of Congressional Mandates and Prohibitions Regarding Databases of Student Information**

Section 1015c was enacted to stop the Department from replacing portions of the Integrated Postsecondary Education Data System ("IPEDS"), which contains aggregate student data collected from institutions of higher education, with a more detailed database—a "student unit record system"—that would have stored information about individual students. The Department's National Center for Education Statistics published a study examining the feasibility of such a system in March 2005. *See* ALISA F. CUNNINGHAM, ET AL., NAT'L CTR. FOR EDUC. STATISTICS, U.S. DEP'T OF EDUC., FEASIBILITY OF A STUDENT UNIT RECORD SYSTEM WITHIN THE INTEGRATED POSTSECONDARY EDUCATION DATA SYSTEM (2005) ("FEASIBILITY STUDY"). The study described itself as a "response to growing interest within the postsecondary education community for more accurate measures of net price and graduation rates" and the perceived "growing congressional desire to hold postsecondary institutions accountable for student outcomes." *Id.* at iii. It noted that "aggregate data" of the sort stored in the IPEDS "has some limitations in comparison with [student unit record] data, such as the inability to track the academic progress and experiences of individual students . . . ." *Id.* at iv.[2] The feasibility study suggested that collecting and analyzing student data at the individual level would lead to "better

---

    [2] The study made clear, however, that the Department was not interested in tracking individual students as such, but rather sought the ability to perform detailed analyses on groups of students that would only be possible with student-level data. FEASIBILITY STUDY at 37 ("Estimates created from the [student unit record] database would be reported only as aggregates at the level of institutions or groups within institutions.").

information for informed consumer decisions . . . and more accurate measures for institutional accountability and program effectiveness." *Id.* at xii.

The study acknowledged that the creation of a federal database of information on all postsecondary students could raise substantial privacy concerns. *Id.* at vii ("Concerns have been raised about student privacy and the confidentiality of individually identifiable student data under a federal [student unit record] system."). The mandatory nature of the proposed data collection was thought to be especially troubling. *See id.* (acknowledging "questions about students' rights to withhold or control personal information"); *id.* at 34 ("Some critics of a federal [student unit record] system believe that the simple existence of such a database is a violation of privacy."). And the ethical concerns were especially acute in the case of "students who do not receive federal student aid." *Id.* at vii; *see also id.* at 34 ("Some panelists . . . questioned the need to report data on students who do not receive federal student aid, asking what the compelling government interest is in collecting data on nonaided students and wondering whether the involuntary inclusion of such students violates their rights of refusal."). But without data on those students, the database would lose a great deal of its analytical power. *Id.* at vii ("[D]ata on nonaided students are a critical element to compute graduation rates, retention measures, and other indicators. Information on nonaided students would be necessary in order to compare these measures with information on students receiving student aid.").

Of course, student unit record systems were far from novel. To the contrary, the feasibility study noted that student "[u]nit record systems are maintained by most colleges and universities to track registration for courses, academic performance, degree and certificate completion, [and] financial aid," and that "governmental . . . organizations also maintain [student

unit record] systems on specific groups of students." *Id.* at iii. Of particular note was "the National Student Loan Data System" which "compiles information on all recipients of federal student loans." *Id.*

The National Student Loan Data System ("NSLDS") was created in response to a congressional mandate. Congress first authorized the NSLDS in 1986, empowering the Department "to establish and carry out a nationwide computerized student loan data system containing information regarding loans" made through two federal programs. Pub. L. No. 99-498, § 407(a), 100 Stat. 1486 (codified at 20 U.S.C. § 1092b(a) (Supp. IV 1986)). The database was to include the names and social security numbers of borrowers (and parents, in the case of dependent borrowers) as well information on loans, their guarantors and issuers. 20 U.S.C. § 1092b(a)(1)–(4) (Supp. IV 1986). Researchers were to be given access to the database, *see id.* § 1092b(b)(2)(A), but not to information that would identify individual students, *id.* § 1092b(b)(3).

Congress substantially revised this authority in 1989, increasing the information to be collected about borrowers and their loans, Pub. L. No. 101-239, § 2008, 103 Stat. 2121 (codified at 20 U.S.C. § 1092b(a)(1)–(10) (Supp. I 1989)), and providing that the scope of the database was "not limited to" the information required by statute, 20 U.S.C. § 1092b(a) (Supp. I 1989). The provisions regarding access for researchers were removed. *See id.* § 1092b. Over the next several years—before the NSLDS was actually implemented—Congress made a number of smaller revisions to the scope of the database, adding required fields, *see* Pub. L. No. 101-610, § 204, 104 Stat. 3172 (codified at 20 U.S.C. § 1092b(a)(5) (Supp. II 1990)), folding the Pell Grant database into the NSLDS, *see* Pub. L. No. 102-325, § 487, 106 Stat. 623 (codified at 20

9

U.S.C. § 1092b(g) (Supp. IV 1992)), and including loans made through a third federal program, *see* Pub. L. No. 103-208, § 2(h)(38)–(41), 107 Stat. 2478 (codified at 20 U.S.C. § 1092b (Supp. V 1993)).

The statutory authority for the NSLDS remained essentially unchanged until the Department published its study on the feasibility of a much larger student unit record system.[3] Months after the feasibility study was published, the House Committee on Education and the Workforce reported a precursor to 20 U.S.C. § 1015c, which the House passed the following year. H.R. 609, 109th Cong. § 109 (as passed by House, Mar. 30, 2006). The Committee explained, under the heading "Unit record system prohibition," that it

> . . . believes that students pursuing higher education have an expectation of basic privacy protections, and that students should not be forced to relinquish their fundamental privacy rights as a condition of attending an institution of higher education. Further, the Committee disagrees with claims that the only means of assuring accountability in higher education is to collect and maintain a vast, Federal database of private, personally identifiable information about all students enrolled in higher education. Accountability is among the core principles identified by the Committee to help higher education reform, and the Committee believes accountability will be achieved by placing more information about colleges and universities into the hands of students—not by placing information about students into a massive new database that could compromise fundamental privacy protections.

H.R. REP. NO. 109-231, at 162-63 (2005).

The following year, a commission appointed by the Secretary of the Department published a major report on the future of higher education, in which it criticized the "lack of clear, reliable information about the cost and quality of postsecondary institutions" and the "remarkable absence of accountability mechanisms to ensure that colleges succeed in educating

---

[3] Congress made one amendment, in 1998, to set a deadline for the Department to satisfy a pre-existing requirement. *See* Pub. L. No. 105-244, § 487, 112 Stat. 1746 (codified at 20 U.S.C. § 1092b(a) (Supp. IV 1998)).

students." SEC'Y OF EDUC.'S COMM'N ON THE FUTURE OF HIGHER EDUC., U.S. DEP'T OF EDUC., A TEST OF LEADERSHIP: CHARTING THE FUTURE OF U.S. HIGHER EDUCATION at vii (2006) ("2006 Report"); *see also id.* at 4 ("We have noted a remarkable shortage of clear, accessible information about crucial aspects of American colleges and universities, from financial aid to graduation rates. . . . This lack of useful data and accountability hinders policymakers and the public from making informed decisions . . . ."). "The result" of these deficiencies, the report concluded, "is that students, parents, and policymakers are often left scratching their heads over the answers to basic questions, from the true cost of private colleges (where most students don't pay the official sticker price) to which institutions do a better job than others not only of graduating students but of teaching them what they need to learn." *Id.* at vii; *see also id.* at 4 ("Because data systems are so limited and inadequate, it is hard for policymakers to obtain reliable information on students' progress through the educational pipeline."). To address this concern, the report recommended "the creation of a consumer-friendly information database on higher education with useful, reliable information on institutions, coupled with a search engine to enable students, parents, policymakers and others to weigh and rank comparative institutional performance." *Id.* at 20. The report also strongly endorsed the creation of a federal student unit record system of the sort contemplated by the earlier feasibility study, "a *privacy-protected* higher education information system that collects, analyzes and uses student-level data as a vital tool for accountability, policy-making, and consumer choice." *Id.* at 21 (emphasis in original). The report continued,

> A privacy-protected system would not include individually identifiable information such as student names or Social Security numbers at the federal level. Such a system would allow policymakers and consumers to evaluate the performance of institutions by determining the success of each institution's students without knowing the

11

>identities of those students.  It is essential for policymakers and consumers to have access to a comprehensive higher education information system in order to make informed choices about how well colleges and universities are serving their students, through accurate measures of individual institutions' retention and graduation rates, net tuition price for different categories of students, and other important information.

*Id.*  In its report, then, the Department emphasized the significance of the problem with its existing databases, and vigorously argued that student privacy would not be infringed by the development of a database equal to the needs of the public and the Department.

Congress was unpersuaded.  Not only did it enact 20 U.S.C. § 1015c in 2008, *see* Pub. L. No. 110-315, § 113, 122 Stat. 3110–11, it also revised the statutory authority for the National Student Loan Data System.  For the first time, Congress required the Department to "take actions necessary to maintain confidence in the data system, including, at a minimum . . . prohibiting nongovernmental researchers and policy analysts from accessing personally identifiable information" and "creating a disclosure form for students and potential students that . . . explains the measures taken by the Department to safeguard the students' data."  Pub. L. No. 110-315, § 489, 122 Stat. 3304 (codified at 20 U.S.C. § 1092b(d), (2), (3)(E) (Supp. II 2008)).  In addition to other actions obviously intended to address concerns about student privacy, *see generally* 20 U.S.C. § 1092b(d) (Supp. II 2008), the Department was instructed to study "available mechanisms for providing students and parents with the ability to opt in or opt out of allowing eligible lenders to access their records in the National Student Loan Data System" and "appropriate protocols for limiting access to the data system," *id.* § 1092b(e)(2)(A).

### B.  The Scope of 20 U.S.C. § 1015c

With that history in mind, the court returns to the question at hand: whether the vacated reporting requirements committed the Department to the creation of a database of individually identifiable student information that was either new or unnecessary for the operation of covered programs, in violation of 20 U.S.C. § 1015c.  In its earlier opinion, the court concluded that, once the debt measures were vacated, the Department could not "show that the database it would maintain"—by which the court meant the information collected under the reporting requirements—"is necessary for the operation of any . . . Title IV program."  *APSCU*, 870 F. Supp. 2d at 155.  This analysis was flawed.  By its plain language, 20 U.S.C. § 1015c applies to databases in their entirety—it is the *database* which must be *necessary*, not (as the court suggested) any marginal addition to that database.  To ask whether each piece of information added to a database is itself necessary for the operation of covered programs would create a bar on data collection far more stringent than the one that Congress actually enacted.  In short, 20 U.S.C. § 1015c plainly applies to *databases* and not to *data*.  And the information collected pursuant to the reporting requirements was not an independent database.  Rather, it was to be added to the National Student Loan Data System.

The NSLDS is clearly "a Federal database of personally identifiable information on individuals receiving assistance under this chapter," 20 U.S.C. § 1015c(a), that is "necessary for the operation of programs authorized by subchapter . . . IV . . . of this chapter," *id.* § 1015c(b)(1), and that "was in use by the Secretary, directly or through a contractor, as of the day before August 14, 2008," *id.* § 1015c(b)(2).  The NSLDS includes "the names and social security numbers of . . . borrowers," 20 U.S.C. § 1092b(a)(2), is used to keep records of the Title IV aid that the Department disburses, *see* Notices, Department of Education, 75 Fed. Reg. 54,331,

54,332–33 (Sept 7, 2010), and is therefore "necessary for the operation of" those aid programs. Finally, the NSLDS was in use by the Department long before August 14, 2008. *See, e.g.*, Notices, Department of Education, 59 Fed. Reg. 33,491 (June 29, 1994) (announcing creation of the NSLDS). The Department is obviously not barred from maintaining it.

The more difficult question is whether 20 U.S.C. § 1015c(b)(2) establishes a limit on the extent to which necessary and pre-existing databases can be altered. Is there a point at which an existing database could be changed so substantially that it effectively became a new database? In its earlier opinion, the court suggested that some such point must exist. If it did not, 20 U.S.C. § 1015c(b)(2) would not bar any data collection at all: the Department could collect whatever individually identifiable student information it wanted, so long as it incorporated that information into a database that was necessary for some covered purpose. *See APSCU*, 870 F. Supp. 2d at 155 n.8. In its supplemental briefing on this motion, the Department concedes the point: some additions to existing databases are barred by statute. *See* Defs.' Reply in Support of Supplemental Briefing [Dkt. # 34] at 7–9. But how is a court to determine which ones? The Department suggests that "so long as there is a legitimate need to maintain the new information in the existing database, the new information fits within the overall purpose of the existing database, and the data stored in the database is, as a whole, necessary for the operation of a covered program," then the addition is permitted. Defs.' Supplemental Br. at 6.

The Department further suggests that it should receive full *Chevron* deference for its interpretation of 20 U.S.C. § 1015c. That familiar framework is somewhat difficult to apply here. Under *Chevron*, the first inquiry is whether "the intent of Congress is clear." *TNA Merchant Projects, Inc. v. FERC*, 616 F.3d 588, 591 (D.C. Cir. 2010) (quoting *Chevron U.S.A. v.*

*Natural Res. Def. Council*, 467 U.S. 837, 842 (1984)).  If so, the court "must give effect to [that] unambiguously expressed intent."  *Id.* (quoting *Chevron*, 467 U.S. at 843).  "But 'if the statute is silent or ambiguous with respect to the specific issue,' the court must uphold the agency's interpretation as long as it is reasonable."  *Id.* (quoting *Chevron*, 467 U.S. at 843); *see also Nat'l Cable & Telecomm. Ass'n v. FCC*, 567 F.3d 659, 663 (D.C. Cir. 2009) ("If the statute is ambiguous enough to permit the agency's reading. . . [a court must] defer to that interpretation so long as it is reasonable.").  There is a great deal of case law on the question of what form an agency's interpretation must take in order to receive *Chevron* deference, and the parties dispute whether the Department's interpretation qualifies.  But the specific question at hand—How much change to a given database does 20 U.S.C. § 1015c allow?—is almost impossible to answer in the abstract, as the Department has framed its interpretation.  Because one database differs greatly from another, any answer to that question must necessarily rest on a comparison between the particular database as it existed previously and the database as it would exist in its altered state.  The court therefore turns first to that comparison.

      Before the regulations at issue here were promulgated, the NSLDS contained "records on borrowers who have applied for and received loans under" a variety of federal programs, as well as "records on recipients of Federal Pell Grants and persons who owe an overpayment on a Federal Pell Grant, Federal Supplemental Educational Opportunity Grant or Federal Perkins Loans."  Notices, Department of Education, 64 Fed. Reg. 72,384, 72,395 (Dec. 27, 1999).  It did not contain any information about students who were not direct beneficiaries of Title IV programs and had not applied to benefit from those programs.  Defs.' Supplemental Br. at 7–8.  After the reporting requirements took effect, the database was expanded to hold detailed

information about every student enrolled in a gainful employment program, whether or not that student had applied for or received any federal grants or loans. *See* Notices, Department of Education, 76 Fed. Reg. 37,095, 37,096–97 (June 24, 2011); *cf.* 34 C.F.R. § 668.6(a)(1)(i).

The Department first notes that this expansion only added twenty-three data fields to a database that contained more than nine hundred. Defs.' Mot at 12. But the ratio of added fields to pre-existing fields cannot determine whether a change is permitted by 20 U.S.C. § 1015c(b)(2). If the number of new fields settled the question, it would be permissible to expand the NSLDS to include individual information on every student in higher education, so long as that information was of the sort already collected about Title IV applicants and beneficiaries—indeed, such an expansion might not require any new fields at all. The Department next urges that the additional data would not have been collected for the purpose of tracking individual students but rather to calculate aggregate information about gainful employment programs, thereby achieving "accountability through disclosures." Defs.' Reply in Support of Supplemental Briefing at 11. Elaborating on that point, the Department explains that although it "regularly collects data on . . . individuals who did not receive Title IV assistance from institutions at the aggregate level through the Integrated Postsecondary Education Data System (IPEDS) surveys . . . . data provided at that aggregate institution-wide level cannot generate the program-level assessments needed to give a meaningful disclosure to consumers." *Id.* at 11 n.3. Of course, that is precisely the argument that led the Department to propose replacing portions of IPEDS with a student unit record system—the proposal that Congress blocked by enacting 20 U.S.C. § 1015c.

The Department goes on to point out that the NSLDS has been altered since it was created, with no indication from Congress that such alterations were impermissible, and argues that although Congress amended the language authorizing the NSLDS when it enacted 20 U.S.C. § 1015c, Congress "did not take any action to limit the Department's use of the NSLDS." Defs.' Mot at 12. That is not strictly true. As discussed above, Congress added many statutory provisions dealing with student privacy to the language authorizing the NSLDS, *see* 20 U.S.C. § 1092b(d) (Supp. II 2008), indicating at the least a concern about how the Department was managing that database. And, more importantly, Congress enacted 20 U.S.C. § 1015c, which even the Department concedes places some limits on its ability to expand the NSLDS. *See* Defs.' Reply in Support of Supplemental Briefing at 7–9.

Having set those arguments aside, the court returns to the Department's central contention: that 20 U.S.C. § 1015c is ambiguous as to the question of whether the NSLDS could legally be expanded in accordance with the reporting requirements, 34 C.F.R. § 668.6(a), and that the Department deserves deference for its interpretation. In the preamble to the reporting requirements, the Department said that 20 U.S.C. § 1015c,

> . . . places restrictions on the Department's ability to develop, implement, or maintain a new database of personally identifiable information about individuals attending institutions and receiving title IV, [Higher Education Act] program funds, including systems that track individual students over time. It does not prohibit the Department from including such information in an existing system that is necessary for the operation of the Federal student aid programs. . . . Institutions reporting that students have started or completed a program *for which those students received title IV, HEA program funds* will augment the existing information in the Department's systems that are used to monitor and maintain the operations for the title IV, HEA programs. The information is also being compiled to create aggregate information to evaluate whether a program demonstrates that it leads to gainful employment for its students, rather than to monitor the individual students attending those programs over time. For those reasons, the reporting and use of this information is not prohibited under the law.

Program Integrity Issues, 75 Fed. Reg. 66,832, 66,842 (Oct. 29, 2010) (emphasis added). As discussed above, it is unreasonable to interpret 20 U.S.C. § 1015c, which was enacted to block the Department from collecting information on individual students for the purpose of producing more useful aggregate statistics, *see* FEASIBILITY STUDY at iv, 37, to allow for the collection of information on individual students so long as that information is used to produce aggregate statistics and not to track individual students. And it is inaccurate to suggest, as the regulatory preamble does, that the database expansion would be limited to "personally identifiable information about individuals attending institutions *and* receiving title IV, [Higher Education Act] program funds." Program Integrity Issues, 75 Fed. Reg. at 66,842 (emphasis added). To comply with the reporting requirements, the NSLDS was expanded to hold detailed information about every student enrolled in a gainful employment program, whether or not that student had applied for or received any federal grants or loans. *See* Defs.' Supplemental Br. at 7–9; Notices, 76 Fed. Reg. at 37,096–97; 34 C.F.R. § 668.6(a)(1)(i).

The Department, then, is left with its argument that the reference to "successor system[s]" in 20 U.S.C. § 1015c "provides the Department with significant leeway to alter or expand an existing database," Defs.' Supplemental Br. at 5, and its suggestion, first articulated in this litigation, that "so long as . . . the new information fits within the overall purpose of the existing database" and meets other criteria, the expansion is allowed, *id.* at 6. Even if the court accepted the Department's interpretation of the statute—whether out of deference to or because of the persuasiveness of that interpretation—it would still find the expansion at issue here barred. The National Student Loan Data System is a database "containing information regarding loans made, insured, or guaranteed under" various federal programs, 20 U.S.C. § 1092b(a) (Supp. II

18

2008), as well as information about federal grants, *see id.* § 1092b(h). Its "overall purpose" has never included the collection of information on students who do not receive and have not applied for either federal grants or federal loans. To expand it in that way would make the database no longer "a system (or a successor system) that . . . was in use by the Secretary, directly or through a contractor, as of the day before August 14, 2008." 20 U.S.C. § 1015c(b), (2). The Department could not create a student unit record system of information on all students in gainful employment programs; nor can it graft such a system onto a pre-existing database of students who have applied for or received Title IV assistance. For that reason—and not, as the court previously held, because the added information is unnecessary for the operation of any Title IV program—the expansion is barred by the statutory prohibition on new databases of personally identifiable student information. Because the reporting requirements mandated that expansion, they will remain vacated.

The court recognizes that 34 C.F.R. § 668.6(b)(1)(v), which requires schools to disclose each program's median loan debt as calculated by the Department, may not function properly without the reporting requirements, and that the Department (as it says, Defs.' Mot. at 8) will be unable to calculate a program's repayment rate and debt-to-income ratios, even for informational purposes, without the data that was to be reported. But Congress has forbidden the collection of that data in the format that the Department intended.

## IV.  CONCLUSION

For the reasons explained above, the Department's motion to amend the judgment will be denied.

>                                 Rudolph Contreras
>                                 United States District Judge

Date: March 19, 2013